BENHAM CONSTRUCTION COMPANY, a Corporation,

*Plaintiff and Appellant,*

vs.

C. A. RENTZ,

*Defendant and Respondent.*

(No. 2497; December 11, 1951; 238 Pac. (2d) 927)

For the plaintiff and appellant the cause was submitted upon the brief and also oral argument of Byron Hirst, of Cheyenne, Wyoming.

For the defendant and respondent the cause was submitted upon the brief and also oral argument of Paul B. Lorenz of Cheyenne, Wyoming.

## OPINION

Per Curiam

This action arose in consequence of a disagreement between the original contractor and a subcontractor concerning the proper performance of that portion of an original construction contract sublet by the former to the latter. The original contractor, Benham Construction Company, a corporation, plaintiff below and hereinafter usually so designated, or as the "Company" or "appellant" brought the action in the district court of Laramie County, Wyoming, against the subcontractor, C. A. Rentz, hereinafter conveniently referred to as either the defendant, the respondent or by his surname, Rentz. The pleadings of the parties disclose with reasonable clarity their respective claims and the issues made up which the court tried without a jury.

Plaintiff's petition alleged in substance: Paragraph I that it is a corporation duly functioning under the laws of the State of Wyoming.

In paragraph II that during the year 1949 plaintiff agreed to construct a gymnasium and classrooms for School District No. 6 in Carbon County, Wyoming, in accord with certain plans and specifications.

In paragraph III that in May 1949 responding to a request therefor made by the Company for bids for supplying certain plaster work and material in connection with the project above mentioned the defendant submitted a bid reading:

"C. A. RENTZ
PLASTER AND STUCCO CONTRACTOR
819 West 10th Street
Phone 7622
Cheyenne, Wyo.
May 19, 1949
Benham Construction Co.
1015 E. Lincolnway
Bid—School
Medicine Bow, Wyoming

This bid includes plastering labor only and material except sand and vermicalite. Two (2) ceilings, one each in locker rooms. The rest side walls only to be plastered. Stage and two (2) small halls off stage not to be plastered. Girls and boys locker rooms to be cement plaster of sand finish. Other plaster to be lime sand finish, except for wainscoat five (5) foot to be cement smooth.

$2,450.00"

That it was then orally agreed between the parties that if and when the defendant should complete said work and furnish said materials in a good and workmanlike manner the Company would pay Rentz the sum of $2,450 therefor; that it was also agreed that the plaintiff would furnish necessary sand and vermicalite and coloring material and the defendant would supply all other labor and materials necessary to complete the work properly.

In paragraph IV it is averred that the defendant commenced and carried on the work aforesaid and represented to the plaintiff that he required money to go on with his operations and in continuance of the work; that the Company relying upon defendant's performance, that he was performing and would perform the work as agreed did, on June 25th, 1949, advance to the said defendant $1,500.

Paragraph V states that plaintiff has performed all

the conditions of the agreement to be performed by him.

Paragraph VI of plaintiff's petition charged that the defendant:

"The *defendant* failed to comply with his agreement to plaintiff's damage in the following particulars, in that (1) his *work* and *labor* were so unskillful and incompetent and (2) *the materials* furnished by the defendant were (a) so unsatisfactory and (b) so improperly applied that the plaster walls cracked badly and the plaster crumbled and loosened from the base, and (3) the surfaces of the walls were not lined properly and had an unreasonably uneven and rolling surface, all to such an extent and degree that said work and materials were and are of no value whatever to plaintiff or to said School District No. 6." (Italics supplied.)

that as a result of these failures on the defendant's part in performing as agreed, plaintiff was obliged to employ other persons to tear out the work done and materials furnished by defendant and replace same with proper work and materials and "to correct the errors made in many cases"; that plaintiff was delayed in completing the job and obtaining payment therefor, being damaged in the sum of $500 for this and in the sum of $1,500 advanced to defendant. Judgment was asked against the defendant in the sum of $2,000 and costs.

To this pleading the defendant filed his answer and cross-petition; the answer admits the allegations of paragraphs Nos. I and III of plaintiff's petition; admits that during 1949 plaintiff agreed to construct a gymnasium and classrooms for School District No. 6 in Carbon County, Wyoming, and that defendant commenced the work by him to be performed as described in plaintiff's petition and the payment to him by plaintiff on June 25, 1949, of $1,500 on representation by him that he required such sum of money to carry on his operations.

As to paragraph No. V of plaintiff's pleading the allegations thereof are denied.

Defendant denies that he failed to comply with his agreement to plaintiff's damage in the particulars alleged; also that the work done and materials 'furnished by the defendant were and are of no value to plaintiff or to the said School District No. 6; he denies that as the alleged result of defendant's failure to perform it was necessary for plaintiff to employ others to tear out the work done and materials furnished by defendant and replace them with proper work and materials and to correct errors. The defendant denies that in consequence of any alleged failure on his part to comply with his agreement plaintiff was delayed in completing the job and obtaining payment therefor as alleged and denies that by reason thereof plaintiff has been damaged in the amount of $500, the $1,500 advance to defendant or in any other sum. He denies each and every allegation in plaintiff's pleading "not hereinbefore specifically admitted or denied."

Defendant's cross-petition in its paragraph No. 1 stated that at all times material herein plaintiff was a corporation organized under Wyoming law. In its paragraph 2 it is averred that:

"That there is due and owing defendant from and by the plaintiff on account the sum of $950.00, together with interest thereon at the rate of seven per cent per annum from and after July 28, 1949; that a copy of the account with all credits and endorsements thereon is hereto attached, marked defendant's exhibit 'A', and by reference is made a part hereof."

Exhibit "A" mentioned in the foregoing paragraph is as follows:

"C. A. RENTZ
PLASTER AND STUCCO CONTRACTOR
819 West 10th Street
Phone 7622
Cheyenne, Wyoming
Benham Construction Co., a corporation
1015 East Lincolnway
School Job Medicine Bow, Wyoming
Job started 6-15-49.
Job finished 6-28-49.

$2,450.00
6-25-49 .................................................Paid     1,500.00
                                                     ──────────
                                        Bal. Due  $   950.00"

Plaintiff thereafter filed its answer to defendant's cross-petition admitting the allegations of that pleading in paragraph 1, and denying those of paragraph 2 thereof.

In paragraph III of said Company's answer it is averred:

"that there is and there was no account existing between the plaintiff and defendant, but that the plaintiff and defendant made a contract which the defendant has wholly failed to perform all as alleged in the petition filed herein and the allegations of Paragraphs 2, 3, 4, 5 and 6 of which petition hereby are referred to and made a part of this answer to cross-petition to the same effect as if the same were here set forth at length."

In paragraph IV it is stated that interrogatories are attached "pertinent to the issues made in the pleading" which defendant is requested to answer under oath.

Plaintiff's prayer is that defendant take nothing by his cross-petition but that it should be dismissed at defendant's cost and for such other relief as may seem proper.

It is unnecessary to set forth the interrogatories above mentioned or the answers thereto in view of the

facts adduced upon the trial of the case and the result reached in the district court by its judgment which omitting formal matters will be subsequently set forth. Defendant's reply to the answer of the plaintiff to defendant's cross-petition is as follows: Replying to paragraph III of plaintiff's said pleading defendant incorporates Nos. 2, 3, 4, 5 and 6 of defendant's answer on file herein to plaintiff's petition making them by reference part of defendant's reply to the same effect as if set forth at length. Defendant denies every allegation of fact contained in plaintiff's answer aforesaid not heretofore expressly admitted or denied. The sworn answers of defendant to the plaintiff's several interrogatories are then appended. Recovery of the $950 claimed to be due defendant is prayed for together with interest thereon at the rate of 7% per annum and for such other and further relief as to the court may seem proper.

As above stated the cause was tried to the court and its judgment was:

"the Court does find generally against the plaintiff and for the defendant upon the plaintiff's petition, and the Court does find generally in favor of the defendant and against the plaintiff upon the defendant's cross-petition; the Court does further find that the plaintiff should take nothing by its petition and that the defendant should have and recover of the plaintiff upon the defendant's cross-petition the sum of $950.00, together with interest thereon at the rate of 7% per annum from and after July 28, 1949, in the amount of $48.00, and for his costs herein expended.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED: that the plaintiff have and recover nothing against the defendant, C. A. Rentz, on plaintiff's petition and that the defendant, C. A. Rentz, have, and he is hereby granted, upon his cross-petition, judgment against the plaintiff, Benham Construction Co., in the sum of $998.00 and for defendant's costs herein taxed in the sum of $8.00."

Exception to this judgment was duly taken by the Company, allowed, and this appeal ensued.

The questions presented in this case are for the most part questions of fact which it became the duty of the trial court, in the absence of a jury, to resolve. In that connection there should be kept in mind certain rules for the examination of such cases on appeal which this court, like other appellate tribunals generally, has so many times referred to in the past that it would seem unnecessary to again repeat them in our opinions. Clients and counsel alike would be benefited if, before going to the trouble and expense of bringing cases here on appeal, they would give special thought to these rules. They are: (1) Where testimony is conflicting and there is substantial evidence to support it a finding of the trial court will rarely be disturbed here unless it is completely erroneous or against the great weight of the evidence in the case. Williams vs. Yocum 37 Wyo. 432, 263 Pac. 607 and cases cited; Christensen v. McCann et ux 41 Wyo. 101, 282 Pac. 1061 and cases cited. (2) Where the assignments of error are, as here, that the judgment is not supported by the evidence and is contrary to law we have said that the rule is that this court:

"* * * must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it."

See Willis vs. Willis, 48 Wyo. 403, 429; 49 P. (2d) 670; Jacoby vs. Town of the City of Gillette 62 Wyo. 487, 494 and cases cited, 174 Pac. (2d) 505.

With these rules before us we proceed to review some of the testimony in the case at bar. Mr. Benham, a witness for the plaintiff, being the president and prin-

ciptal owner of the Benham Construction Company stated in part that after Rentz had completed the plaster work he, (Benham), went to Medicine Bow to examine it. He found that the walls were cracking where the wainscotting was. Most of the cracking appeared there. They were cracking badly and were very uneven. The walls where the wainscotting was, was where most of the cracking appeared; that when one plasters a wall he uses a long straight edge to make the walls straight and even; after that the finishing coat is put on. Benham laid a four foot level, that was straight, on the walls; there were several places where the walls were either ½″ or ⅜″ from being flat. They were bowed that much in four feet. This was on the centre wall between the gymnasium and the hallway; these cracks opened up and seemed to warp; Benham did not know why they should do that; the School District officers wanted him to tear off all the plaster in the building, but he put on a sample of "Insulplast" that is sprayed on and they liked it very much and said that would be O.K. if he would cover the rest of the plaster with that material and take out some of the rough places and fill in the low taking it off the high. He had that done with a straight edge along the ceiling. He had another plasterer contractor come up and replace the wainscotting. A little piece of plaster, probably 8″ wide possibly two feet long, fell off the wall. He had to tear off the wainscotting on the partition between the gymnasium and the hallway and replace that. The shower rooms were O.K. He went over the classrooms above the wainscotting. The School Board objected to the coloring of the "Insulplast" and required Benham to paint it. Benham spent $2,072.52 in repairing the plaster work on the building so the School Board would accept it. The plaster that Benham removed was not really too thick at all points. Benham did not see where it should be objectionable. It is kind of hard to say

about that; some of these plasterers are more acquainted with that than Benham was. He finished the correction of these defects in the plaster some time in September 1949. After the other contractor, Herrick came up and put new plaster on, the School Board accepted that. Benham has heard no complaints about that.

On cross-examination Benham stated he does not know what caused these cracks. He furnished the sand and vermicalite. On the portion of the wall that was replaced there was no vermicalite. It was supposed to be sand and cement. He thinks they used a little lime in that. In the work done by Rentz either vermicalite or sand was supplied by him, Benham, to Rentz. So far as he knew the quality of the sand was all right. Benham thinks that the quality of the materials Rentz furnished was all right. 25% of the job was completed when Benham paid Rentz the $1,500. Benham had not been checking or observing the work from the time Rentz's work commenced. Up to that time Benham had heard no complaints about Rentz's work and did not see anything wrong at the time that Benham paid Rentz the $1,500. The cracks and unevenness came to his notice after the School Board showed him with a straight edge. The first time Rentz was up there, there were not too many cracks that had opened up. The next time he was there the cracks were really showing up. There were grounds set at the top of the wainscotting. That was where the wainscotting and plaster met. There were grounds put on there. The plastering work is supposed to conform to the grounds. If the grounds are uneven the plaster would be uneven also to a certain extent. *Benham's own employees put the grounds on for this plastering work.* (Italics supplied.) Benham had at first agreed with Rentz to furnish a trazzabead to the latter. The kind of trazzabead they wanted could

not be obtained. The purpose of using it was the same as a ground, a wood ground, to bring the trazza plaster or cement whatever it may be to a straight line, i.e. to keep it even. Rentz was not required to furnish either a trazzabead or ground. Benham was up to Medicine Bow to look at the work in February 1950. There were minor hair line cracks which are to be expected in any job. Benham did some of the work himself. Rentz tried to patch the cracks so it would be acceptable but couldn't do it. The work he went over cracked again. Benham sent some men up to patch the cracks. They did not do a very good job so Benham sent someone later to do the patching in order to make the work satisfactory to the School Board.

Vern Herrick, plastering contractor, patched the wainscotting. There were some fine hair line cracks in the work Mr. Herrick did but the work was smooth and was acceptable to the School Board. The horizontal structural members of the building are $2\frac{1}{4}$ x $2\frac{1}{2}$; this is true of the horizontal structural members which were embedded in vermicalite insulation. They are an angle 3/16ths thick.

Mrs. Briscoe, the treasurer of the School Board, No. 6, as a witness for the plaintiff, stated she was over several times when the boys were doing the plastering work. It was after the completion of the hall that she first noticed the plastering was uneven. After the plasterers finished, it started to crack. The cracks were from the top of the wainscotting to its base; they were large. After the job was finished three of the members of the Medicine Bow School Board District No. 6 went to the building and Benham was to meet them there. It was found that one could rub his hand on the sand finish and the finish would rub off. It was possible to make grooves in the finished plaster. It would crumble and was too soft. The shower rooms were harder. The

sand finish could not be brushed off there. The plaster was of different colorings and the Board would not accept it that way. Some of the cracks were about a foot apart and a pencil could go in them. The Board allowed Benham to cover all the plaster work with "Insulplast" sprayed on; it seemed to work out very well. Just a few cracks appeared in those walls after they were covered by it. Mrs. Briscoe feels that they have a good job now. There are not so many cracks. The School Board required all the wainscotting in the hall to be done over on the inside walls. The Board accepted the repair of the rest of the wainscotting although it was not satisfactory. Mr. Herrick did the "Insulplast" work. The correction of the work was not done by Rentz but by Benham.

Mr. Rentz, as a witness, for himself, testified that he was to be paid by Benham the sum of $2,450 on completion of the work. That he has been paid $1,500 and that there is $950 still due. Mr. McNair was his foreman on the plaster job. Rentz furnished the plaster and cement hydralime. They were all of good quality. The materials furnished by Benham—that is, the coloring, sand and vermicalite—Rentz could not say whether they were good; just did not know. The work at Medicine Bow was done as they did other work. The work cracked while they were working on it and after it was finished. There was an uneven surface along the wainscotting. Rentz does not know what occasioned the cracks. He knows what caused the uneven surface of the walls. That was caused by the grounds, base trim or trazza put on to work to. The ground was very uneven and in consequence the plaster put on would also be. Benham agreed to and did not furnish the trazzabead. Benham told Rentz to go ahead and "do just as good as you can without it." The work was done by Rentz as well as it could be done under the circum-

stances. The cracks on the wainscotting ran up and down, and on the other plaster work they ran across. Rentz does not know what caused these cracks. Benham complained four or five days after the work was completed. Sand finish on a plaster job will rub off on any job of that kind. On cement plaster it will not rub off quite as badly but some will. Benham told Rentz the School Board would not accept the job on account of the cracks and uneven surface. Most of the cracks look now as they did when he finished the job. The work now as it stands is just as bad as when he finished.

Mr. McNair, the foreman for Mr. Rentz on the job, has been engaged in plastering work since 1922. The materials used on this Medicine Bow job were no different from those used in Cheyenne on Rentz's work there. These materials were used according to the manufacturer's specifications in mixing plaster. Portland cement was used on the wainscotting and Acme plaster above the wainscotting. It was a lime cement finish. The materials used on this job were as good as can be purchased. The quality of work done was just as well as (they) could do it under the circumstances under which the work was done. After the job was completed, a week, he saw cracks in it. His opinion is that vibration of the building walls caused the cracks. On the inside partition walls where 2 x 4 studding was used the pattern of the cracks was up and down but the cracks on the outside walls where the steel structure was, ran across. The wainscotting had a cement trowel finish i.e. a smooth finish. About the wainscotting was sand finish with coloring. Sand finish is made with a rubber float. It stands out on plastering and is easily rubbed off until paint or whatever they use to hold it in place is applied. The sand finish will rub off on any sand plaster job; the cement sand finish is a little harder material. Mr. Rentz took Mr. McNair and two other

men up to Medicine Bow and they worked about a day going over all the cracks that had showed up. The work was uneven because the ground was never level from one end of the hall to the other. It was nailed tightly to the lath which follows a pattern of the wall studs which at various times are uneven. In this case it was very uneven. The contractor was using a ⅜" wood ground there where he should have used a ¾" trazzabead or ¾" wood ground in order to get away from making a bull nose on his door frames there. The cross-examination of this witness was concluded by counsel propounding the following question to him: "When you were working on this job in Medicine Bow I asked you whether or not you were drinking anything that was intoxicating." That was objected to as immaterial by opposing counsel. The court ruled that the witness need not answer the question and plaintiff saved his exception thereto and urges it as prejudicial error here.

5 Jones Commentaries on Evidence (2d Ed.) 4608 section 2352 states that:

"The manner of conducting the examination of a witness, and particularly the course of proceeding in cross-examination, rests for the most part in the sound discretion of the presiding judge. As one court observes: 'Limitation of inquiries in respect to matters irrelevant to the point in issue can be so much more appropriately exercised by him that it seems to us this must depend very much upon his discretion, he having regard to the appearance of the witness, and his apparent disposition to disclose the whole truth."

We are inclined to think that the ruling did not transgress the principles stated by the learned text writer i.e. that there was no abuse of discretion in excusing the witness from answering. Nothing appears in the record that would indicate that the witness was endeavoring to conceal the truth of the matters under investigation. His answers to previous questions ap-

pear to be frank and fair. We do not think that the ruling even if it should be regarded as erroneous was so serious an error as to require us to direct a new trial.

In Henderson vs. Coleman 19 Wyo. 183, 115 P. 439, 451, Mr. Justice Potter remarked that:

"The latitude of cross-examination is so largely within the discretion of the trial court that it must, as a general rule, appear to have been flagrantly abused before a verdict will be disturbed on that ground."

Vern Herrick testified as a witness for the defendant that he had been a plasterer for 25 years. He re-plastered the wainscotting in the corridor and one side of the gymnasium; did not have a ground; used a straight edge to straighten the work as best he could; he did the repair work on the wainscotting only; he re-plastered the wainscotting in the corridor on one side of the gymnasium. The work was in good shape when he left it and got through. The previous work was irregular along where the grounds had been. It was plastered to where the ground had been. He does not know whether there was anything about Mr. Rentz's work that may have caused the cracks in the plastering.

Mr. Walter Land testified he had been engaged for 12 years in the construction business; that he was a cement finisher for the plaintiff in connection with the Medicine Bow school house work. He saw the cracks in the work done by Rentz. He was instructed by Benham to repair the cracks he saw. Benham told him to take an old file and dig the cracks out and witness did so. It didn't remedy the condition. The cracks were filled in with patching plaster and several different solutions made for that purpose but it seemed as if they would crack right over. He saw cracks in the work done by Mr. Herrick.

Deming W. Morrison, a witness for the defendant, testified that he was a consulting engineer, a graduate

in Civil Engineering of Stanford University in 1925; that he had had 25 years of general engineering practice of which ten years were spent as chief design engineer of the Engineer Corps, War Department; four years in the army; designing and construction engineer on heavy construction at camps installing steel buildings and reinforced concrete. He is now a consulting hydraulic and structural engineer. He made two thorough examinations, one on March 31st and the other on April 11, 1950 of the Medicine Bow school house job. He found that this building is known in the profession as a typical steel gird building and has steel columns which support the typical bow-string walls truss and also east columns carry the steel structures, also girds which support the exterior finish of the building which is in this case galvanized iron. There is a lean-to which has a structural steel roof and exterior walls attached to the east side of this main building. There are two design partitions located, installed along the building of typical timber construction 2 x 4 studs, frame constructed walls. All of these walls, of course have plaster. The first examination this witness made he examined the plaster work. He found a series of horizontal cracks in the plaster above the wainscotting on all exterior walls. These cracks were straight-running, horizontally, and at a definite distance apart. They formed a definite pattern. He found vertical cracks and one horizontal crack in the west wall about two or three inches below the top of the wainscotting running horizontally. All of these cracks were between plaster that encased the steel columns. He saw vertical cracks throughout the building on the wainscotting. Many were open cracks. They had the indication of being newly developed, and many cracks were patched and some patched cracks had opened up. The cracks formed a definite pattern, both the vertical cracks and the horizontal cracks. Some were perpendicular to the studding

of 1/16th of an inch and one side of the crack would be at a different elevation or higher and further out from the wall than the one on the other side—than the wall on the other side.

The external walls are plastered with cement. The witness was talking about inside the building entirely. External walls are usually the walls that are outside internal walls and are like the corridor walls. A structural engineer does the designing and planning of the framework of the building; that is the loads, elevations that are permitted. The witness did the designing and preparing of the plans of the structural steel for the education building over at the University of Wyoming that is just going up. He did that for a firm of architects. The structural steel building and steel work has to support the major portions of the building and anything that is attached to it. The loads must be carried by that structural steel or any loads applied to the structural steel will be transferred to, the plaster. Therefore the steel work must be worked right along in conjunction with load and plan of the interior finishing of the building. As a structural engineer he has to inform himself intimately as to all the construction on a given building, the steel and wood, plastering and other construction elements where it definitely applies to the structural building as it does in this case. The witness found some of the open cracks were as much as 1/16th of an inch open. The horizontal cracks were absolutely horizontal at certain definite spacing on the inside of the exterior walls and by measurements indicated that they were at the junction or rather the position of the horizontal girds or struts, which are primarily placed to support the galvanized iron siding on the exterior of the building. Some of these cracks had been patched up and the patches had again cracked. On the computations of the witness the size of the

members of the building, the building of exterior walls and interior walls, the exterior part of the building is not suitable for plaster. Based upon the testimony given by Mr. Land and Mr. Rentz that the original cracks had developed about a week after Mr. Rentz completed his work again re-appeared after the work was done over and based upon the examination made by the witness of this building showing that cracks again appeared in the same places and witness' knowledge as a structural engineer and his examination of the building and what he discovered there with respect to the pattern of the cracks or location and size, and based additionally upon his examination of the plans and his knowledge of structural engineering he is in a position to give an opinion as to what caused the original cracks in this plaster. That opinion is that the deflections of the building due to the wind loads resulting from the wind blowing against the building created such movements as to cause the plaster cracks. The basis for his opinion he stated is: "The pattern of the cracks, the relationship to the horizontal members, girds, those struts between the columns, also, from the mathematical computations, I believe the wind load to the ends or sides of the building, according to the accepted practice."

One of the primary things that causes plaster to crack is the amount of sway or as it is called the deflection of the members supporting the plaster. The primary cause is a moving structure; one is excessive sag or sway or deflection of the members supporting the lath or plaster; also cold, in an unheated building where it is left without heat will cause cracks in plaster; shrinkage will cause cracks; that is shrinkage of the plaster. Also movement of the rock lath or metal lath behind the plaster; the weight of plaster so that it pulls the nails out of the rock lath if it is improperly nailed;

moving of the studs and additionally green lumber will cause them. The cracks the witness observed on March 31st and April 11th 1950 were caused by structural defects.

Mrs. Briscoe testified on rebuttal that the Medicine Bow School Board accepted the steel type building because they could not get enough money raised for any other type. The School Board made no request of Mr. Benham to remove the plaster on the walls of the classrooms, the Superintendent's office and the girls' locker rooms because they were not cracked as badly as the hall walls—which the Board ordered Benham to take off and have redone.

From the foregoing review of the evidence which should properly be considered under the rules of appellate practice hereinbefore recited and constantly keeping in mind the general finding of the court in defendant's favor it is evident that the trial court concluded that while the ultimate result of defendant's work on the Medicine Bow School building job was unsatisfactory in some respects, yet it was not the fault of the defendant that it was so. There was evidence as we have seen that the uneven surface of the plastering was caused by plaintiff's placing the grounds on the walls which were not straight as they should have been, thereby obliging the defendant's employees to do the work in such a fashion as to produce an uneven surface. Also it is in evidence that the plaintiff did not furnish a trazzabead as he agreed to do which likewise conduced to this unsatisfactory result. There was evidence too that the cracks in the plastering were caused—not by defendant's improper workmanship—but by the structural defects inherent in the building and the vibration due to the type of building used. It is further in evidence that the School Board could not raise enough money to have a different type of wall construction in-

stalled. Evidence also appears in the record that even after the plastering was repaired by the plaintiff, the cracks again appeared. The coating of "Insulplast" that was ultimately put on by plaintiff in an endeavor to meet the criticism of the School Board was itself subject to cracking and it did so. Additionally it is in evidence that no objection was made by the plaintiff or School Board to certain portions of the work done by the defendant and that it was accepted. All of the materials used by Rentz were the best obtainable and were satisfactory to the plaintiff. All of these facts could have been found by the Court upon the proofs submitted and it can reasonably be inferred that they were so found. That they were sufficient to sustain the judgment rendered we have little doubt. We are obliged to conclude that the trial court could properly enter the judgment it did. It is far from clear that a new trial would produce any different result. The judgment of the District Court of Laramie County should be affirmed and an order to that effect should be entered.

*Affirmed.*