**FIRST NATIONAL BANK OF THERMOPOLIS, Appellant (Plaintiff below),**

v.

**Dwight BONHAM, Wyoming State Bank Examiner, and First State Bank of Thermopolis and its Organizers and Proposed Officers and Directors in their official capacity, Appellees (Defendants below).**

No. 4640.

Supreme Court of Wyoming.

Jan. 20, 1977.

Jack Speight and Brent R. Kunz, Hathaway, Speight & Kunz, Cheyenne, signed the brief and Brent R. Kunz appeared in oral argument for appellant.

Richard L. Eason and Stephen G. Everall, Simon, Eason, Hoyt & Malone, Denver, Colo., signed the brief and Richard L. Eason appeared in oral argument for appellees; Marty & Ragsdale, Green River, were on the brief as Wyoming counsel.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

From an order of the state examiner granting a charter to the First State Bank of Thermopolis, applicants-appellees, the First National Bank of Thermopolis, protestant-appellant and only bank in Hot Springs County, petitioned the district court for review, which affirmed the examiner. Protestant now appeals to this court. We will affirm. The issues as presented by the appellant are:

1. "Whether the Examiner deprived Protestant of a fair hearing and due process of law in remanding the case to the Senior Bank Examiner for further evidentiary and fact finding duties, and then in re-opening the hearing to receive the evidence acquired during the Senior Bank Examiner's investigation."

2. "Whether the Examiner deprived Protestant of a fair hearing and due process of law in limiting the scope of cross-examination and rebuttal evidence at the September 24, 1974, re-hearing."

3. "Whether the Examiner has legal authority at the conclusion of the initial hearing on the bank charter application on March 5, 1974, to remand the case to the Senior Bank Examiner for further evidentiary and fact finding duties, and then to re-open the hearing on a more narrow and limited scope on September 24, 1974."

4. "Whether the findings of fact and final order issued by the Examiner on December 5, 1974, were supported by substantial evidence in the record."

The first three issues will be discussed together because of their interrelationship. The applicants for bank charter have raised a question with respect to their motion to dismiss the petition for review in the district court. We will discuss that point last and abide by the district court's decision in that regard.

At the close of the evidence at the first hearing on the application, the evidence of the applicants and the protestant, as to one phase related to the need for another bank in Thermopolis, was acutely divided. While under advisement, because of the wide difference, the state examiner notified the parties that:

"[I]t has been found that: evidence presented with respect to 'need and convenience' and 'economic feasibility' *is inconclusive;* findings of the investigation by the State Examiner contrast sharply with evidence received during the public hearing of March 5, 1974; * * *.

"The State Examiner has therefore remanded the case to the Senior Bank Examiner for more extensive investigation. It is anticipated that the public hearing will be reopened at a later date * * *." (Emphasis added.)

The protestant took exception to that action, urging that if the evidence was inconclusive, the applicants had failed in their proof and the application should be denied. The further investigation proceeded.

The independent inquiry disclosed a substantial community need and support for an additional bank arising out of a prevailing use by local citizens of out-of-town banks, as well as an expanding economy. The examiner submitted the report of the senior bank examiner containing the newly-acquired information to the parties and informed them that:

"Upon receipt of this communication, interested parties have twenty (20) days from receipt of this letter in which to give notice of intent to present evidence in rebuttal to the information contained in said memorandum or to request reopening of the hearing. * * *'"

The protestant again objected to any further hearing, claiming that the examiner must find that applicants failed in their proof and must deny the application. Prior to the further hearing then requested by protestant, the examiner noticed parties that he would limit the evidence to "that which will directly support or rebut the additional data gathered by the Senior Bank Examiner."

At the hearing, the senior bank examiner was asked on cross-examination, "What other data was considered as possibly pertinent?" The examiner sustained an objection that the question was outside the scope of the hearing and confined cross to the "accuracy of what is in the report." By protestant's expert witness, the accuracy of the senior bank examiner's newly-gathered information was disputed. The examiner refused evidence offered by protestant that went outside the limitation imposed. The protestant asserted that when the evidence was reopened, that meant a new hearing in all respects for every purpose.

The examiner, following the supplemental hearing, made and entered his findings, conclusions and order granting charter. It is observed that they have been meticulously drawn, fully justifying the examiner's action and leaving no doubt as to why the charter was granted. Their adequacy as to form is not challenged. There is found within those findings, the real reason and justification for the examiner's need of the further investigation and its application. He pointed out that while the evidence to and including the first hearing carried the burden of the applicants if accepted at face value, he, " * * * alarmed by the divergent and conflicting nature of the testimony given by apparently reliable witnesses concerning the volume of banking business being conducted in out-of-town banks considered that the resolution of this conflict of testimony was vital to a fair and just decision in the public interest, not only with respect to the specific evidence in question but also as it affected the credibility of the witnesses with respect to other testimony received from the same sources." [1]

The findings explain just how the examiner utilized the results of the further investigation which he independently ordered to be made by a member of his staff:

"A substantial volume of business and individual demand deposits are now leaving the community by way of deposit accounts placed with banks located in other communities. Surveys by the Applicants and the testimony of witnesses at the hearing of March 5, 1974 reflect a much higher volume of such out-of-town bank accounts than does the check survey of Protestant witnesses, which suggests that less than ten (10%) percent of Thermopolis citizens have established demand accounts with banks other than the First National Bank at Thermopolis. Responses to the State Examiner's initial field investigation questionnaire suggests [sic] that the discrepancy in testimony was

1. The Order went on to explain:

"The State Examiner being charged with the duty of inquiring into the factors affecting the granting of a charter to engage in the banking business in Wyoming and being the sole judge as to whether a charter shall be granted, deemed it his duty and responsibility to clarify the specific area in question. Accordingly, the State Examiner remanded the case back to the Senior Bank Examiner with instructions to conduct a further investigation into the matter of the degree to which Thermopolis and Hot Springs County businesses and residents conduct their banking business outside of Thermopolis, and with the further instructions that an extensive survey by mail and at least two (2) check surveys by public utility firms serving Thermopolis be obtained. The results of the surveys submitted to the State Examiner by Senior Bank Examiner, Kenneth H. McIlhenny, clearly support the credibility of witnesses and testimony received in the hearing of March 5, 1974, by revealing that a portion of the population of Thermopolis and Hot Springs County maintain bank accounts in two or more banks, thus accounting for the apparent conflict in testimony."

due to the practice of Thermopolis citizens maintaining both local and out-of-town bank accounts. This suggested explanation was verified by further investigation conducted by the Senior Bank Examiner at the instruction of the State Examiner and supports a finding that both sources of testimony were correct. This is so in that while nearly ninety (90%) percent of Thermopolis residents and businesses do maintain bank accounts in the First National Bank of Thermopolis many of these persons also maintain bank accounts with banks in other towns and that the volume of out-of-town banking business is substantial and sufficient to support the projections of the Applicants."

Protestant urges that if any further hearing was to be held at all, it must be a complete rehearing on all the issues submitted in the original hearing and § 13–44(c), W.S.1957, 1975 Cum.Supp.,[2] gives no authority to make a further inquiry nor does the Wyoming Administrative Procedure Act, under which hearings before the examiner are conducted. We note that the cited section is silent on the subject as is the Administrative Procedure Act.

■ A considerable responsibility is placed upon the state examiner. A recognition of his important role has been expressed by this court. His decision comes to this court with a presumption of legality and validity; we may not substitute our judgment for his; he has been entrusted by the legislature as the sole judge as to whether a bank charter shall be granted, and we cannot set aside his judgment unless his decision is arbitrary, fraudulent or illegal; the burden is upon the complainant to show such an abuse. *Wyoming Bancorporation v. Bonham,* Wyo.1974, 527 P.2d 432. The state examiner has been most cautious here and has earned that trust.

A special statutory obligation is imposed upon the examiner to investigate, amongst other responsibilities, with respect to chartering of banks. Section 13–44(c) provides that, "It shall be the duty of the state examiner to inquire into * * * the convenience and needs of the community to be served * * *." Given its ordinary meaning, the phrase "to inquire into" means to investigate, to seek for truth or information by questioning. See Webster. There is no statutory restriction on whether his investigative job takes place before, during or after evidence presented by the applicants and protestant. As long as it is not done secretly, the information gained is made available to the parties and an oppor-

2. Section 13–44(c) provides:

"It shall be the duty of the state examiner to inquire into the adequacy of the capital structure proposed by the incorporators, the future earning prospects of the proposed corporation, the general character and ability of the incorporators, and the convenience and needs of the community to be served by the proposed corporation, and whether or not its proposed corporate powers are consistent with the purpose and requirements of the banking laws of this state. The state examiner shall be the sole judge as to whether or not a charter shall be granted, and he shall have authority either to approve or reject any certificate of incorporation. Before any application is approved or rejected the state examiner shall upon the request of five persons or upon examiner's own motion conduct a public hearing in accordance with the Wyoming Administrative Procedure Act [§§ 9–276.19 to 9–276.33]. If he rejects the certificate of incorporation he shall return it to the incorporators or their representative and it shall not be filed or recorded in any office of this state. Upon the approval of the certificate of incorporation, the state examiner shall endorse thereon his certificate of approval and upon compliance with said examiner's requirements, if any, he shall then issue a charter to such corporation bearing the seal of his office, which charter shall be deemed sufficient authority for such corporation to commence the business of banking. The state examiner shall file in his office one of the triplicate originals of the articles of incorporation, and one in the office of the secretary of state, and he shall return one to the incorporators or their representative. When the charter is either approved or rejected the state examiner shall issue findings of fact and conclusions of law regarding the requirements set forth herein. The state examiner may assess in advance against the applicants for the hearing or upon his own motion against the applicant for the charter, a fee of not in excess of $1000 to defray costs of the hearing, which fee shall be in addition to that provided in section 13–45 of the statutes."

tunity to rebut afforded, we can detect no difference as to when it is done. The same section provides for a public hearing upon request to be conducted in accordance with the Wyoming Administrative Procedure Act.[3] As far as practice procedure before an agency is concerned, that act provides only bare-bones direction and provides specially by § 9–276.20(a)(1), W.S.1957, 1975 Cum.Supp., that each agency shall "Adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available in connection with contested cases."

██ Acting upon the legislature's charge to do so, the examiner adopted rules applying to all public hearings. It especially appears that within their scope, while designed to provide a means whereby every interested person may be heard, nothing there contained should be construed to prevent the state examiner "from conducting such other investigation as may deemed appropriate."[4] The examiner has thus placed into effect a blend of his duty to investigate and his duty to conduct public hearings in accordance with the rules he also had a duty to promulgate. It must be realized that the examiner has a separate and independent task to investigate the feasibility of granting a bank charter, whether or not a protestant interjects itself into the proceeding. He has a function in a way dissimilar to that of a court, where decisions are usually made strictly on the basis of evidence adduced by the adversary parties. The examiner has an added public function, looking to a community interest in banking

convenience and necessity with respect to that closely regulated business affected by a public concern. We note by the record that before this application ever went to public hearing, the staff of the examiner had conducted and completed a field investigation, the report of which was on public file and available for examination. That field examination included conferences with the applicants, opponents, any interested parties as well as a survey of the trade area proposed to be served by the bank, if chartered. That information was made available to all parties. That survey was made in company with representatives of the Federal Deposit Insurance Corporation.

The function of a hearing, whether it be by an agency or court, is to find the truth and act upon it. *Barber v. State Highway Commission,* Wyo.1959, 80 Wyo. 340, 342 P.2d 723, 726. By the rules of procedure adopted by the examiner, a procedure similar to that followed by a court with respect to the reception of evidence is followed. A trial-type hearing has been found to be a sensible, orderly way of presenting evidence and administrative agencies, for the most part, follow that mode. With it must go some of the rules which prevail in the courtroom. In *Scarlett v. Town Council, Town of Jackson, Teton County,* Wyo.1969, 463 P.2d 26, 29, this court, in referring to § 9–276.19(b),[5] said that " 'after an opportunity for hearing' " means an opportunity for a trial-type hearing. Since a trial-type hearing is anticipated, then trial-type rules prevail. This necessarily infers that there will be the transplantation of some trial

---

3. Sections 9–276.19 to 9–276.33, W.S.1957, 1975 Cum.Supp.

4. The examiner's rule referred to provides:
"Section 1. *Scope of Chapter.* This part contains procedures by which the State Examiner may reach informed decisions with respect to applications to charter state banks in which case the State Examiner shall be the sole judge as to whether or not a charter shall be granted. These procedures provide a method by which all persons interested in the subject matter of such applications may present their view. Nothing contained herein shall be construed to prevent interested persons from presenting their views in a more

informal manner when deemed appropriate by the State Examiner, or to prevent the State Examiner from conducting such other investigation as may be deemed appropriate."

5. Section 9–276.19(b)(2) of the Administrative Procedure Act provides under definitions: " '*Contested case*' means a proceeding including but not restricted to rate-making, price fixing and licensing, in which legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." No one disputes that a protested bank charter application is a contested case.

rules, procedures and practices found in a court trial.

In drawing this comparison, we do not overlook the fact that, as here, the examiner is asking for a separate inquiry by a member of his staff. But that fits the unique legislative requirement that the examiner perform from his investigative posture, as well as his quasi-judicial capacity.[6] The protestant was not prejudiced because it was given full opportunity to rebut the evidence adduced by the senior assistant examiner, made available well in advance of the time of the continued hearing. That the further evidence was not to protestant's liking is not prejudice. We think a rule of discretion is particularly applicable where the examiner has a chore beyond that of being a presiding officer, in his duty to investigate.

■ There is nothing innovative about the dual function filled by the Wyoming state examiner. For years, legal technicians have been trying to find fault with the process. A comprehensive annotation, 18 A.L.R.2d 552, entitled, "Administrative decision or finding based on evidence secured outside of hearing, and without presence of interested party or counsel,"[7] develops the question we have here and concludes in its § 4, p. 562, that:

> "Even though an administrative authority has statutory power to make independent investigations, it is improper for it to base a decision or findings upon facts so obtained, unless such evidence is introduced at a hearing or otherwise brought to the knowledge of the interested parties prior to decision, with an opportunity to explain and rebut."

The examiner here afforded the parties every opportunity to rebut the information he furnished them well in advance of the additional hearing, so he is within that recognized rule.

■ Only recently, the Supreme Court of the United States has again given its blessing to the workability of the combination of investigative and adjudicative functions in an administrative matter and it does not violate due process. *Withrow v. Larkin,* 1975, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712. This is a place where we can interrupt the weave of this opinion. The protestant, while not making it a primary issue, does so sometimes by innuendo and sometimes more directly in complaining off and on that the examiner was biased by the independent investigation, conducted by a member of his staff. As said in *Withrow,* the contention that a combination of legislative and adjudicative functions creates a risk of bias in administrative adjudication, must overcome a presumption of honesty and integrity in those serving as adjudicators. The court said that without a showing to the contrary, state administrators " 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy on the basis of its own circumstances.' [Citing case.]" In *Withrow* a state agency employee performed the actual investigation and an assistant attorney general presented the evidence to the agency at the hearings. While in some cases there may be an intolerably high risk of unfairness, we do not find that chance to here exist. There is not the slightest taint of bias or predetermination. The combined function of investigator and judge does not infringe due process. *Kennecott Copper Corporation v. Federal Trade Commission,* 10 Cir. 1972, 467 F.2d 67, cert. den. 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114, reh. den. 416 U.S. 963, 94 S.Ct. 1983, 40 L.Ed.2d 314.

■ The ultimate choice of procedure in an administrative proceedings, in the absence of a statutory mandate, is left to the discretion of the agency and will be reversed only as an abuse of discretion. *Bell*

---

6. As said in *Thompson v. Amis,* 1972, 208 Kan. 658, 493 P.2d 1259, cert. den. 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88, quasi-judicial is a term applied to administrative boards or officers empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions and exercise discretion of judicial nature.

7. See also A.L.R.2d Later Case Service for an update of citations.

*Telephone Company of Pennsylvania v. Federal Communications Commission,* 3 Cir. 1974, 503 F.2d 1250, cert. den. 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684, reh. den. 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118. It is an abuse of discretion for an administrative agency to act without collecting the necessary facts. *Xytex Corporation v. Schliemann,* U.S.D.C., Dist.Colo.1974, 382 F.Supp. 50, 53. Here the examiner did collect the facts. The examiner had no good reason to discount seemingly authentic evidence on both sides but at extremes and he needed an explanation in the performance of his duty to the public. For him to grant or deny the application with the evidence in that posture would have been arbitrary and he would have abused his discretion to not resolve the differences. There is no requirement that the examiner wear blinders.

It is not an uncommon practice in the court trial of a case for the judge to allow the reopening of the evidence following its close. The examiner in presiding over a hearing has a role similar to that of a judge with respect to a trial-type hearing procedure. It has been said by this court that reopening a trial for further evidence is a matter largely in the trial judge's discretion and will not be reversed except for a clear abuse of discretion and the party complaining of such action shows itself prejudiced thereby. *Wyoming Stockmen's Loan Co. v. Johnston,* 1925, 33 Wyo. 457, 467, 240 P. 449, 452. As said in *Barber,* a judge is something more than a referee. The same can be said for the officer presiding over an administrative hearing.

█ The latitude of cross-examination is so largely within the discretion of a trial court that it must, as a general rule, appear to have been flagrantly abused before a decision will be disturbed on that ground. *Benham Construction Company v. Rentz,* 1951, 69 Wyo. 176, 238 P.2d 927. The same applies in an administrative hearing. We see no abuse of discretion. The examiner opened the evidence for a single purpose, the senior examiner presented his report pursuant to that purpose and it was proper for the examiner to confine the cross-examination to that end.

A trial court is allowed considerable latitude in admitting or rejecting rebuttal evidence. *State v. Alexander,* 1958, 78 Wyo. 324, 324 P.2d 831, cert. den. 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed.2d 1733. The same applies in an administrative hearing. We observe that some evidence beyond the scope of the senior examiner's report was injected in spite of objections made and sustained.

█ The protestant has presented us no applicable authority for its assertion that a reopening of the evidence means a whole new hearing. Where an appellant makes only a perfunctory argument in support of a contention, this court need not consider it. *Reed v. Wadsworth,* Wyo.1976, 553 P.2d 1024. There was only a reopening of the same hearing and there was nothing in the procedures followed comparable to the granting of a new trial or new hearing.

█ The protestant claims that the findings are not supported by substantial evidence. We have carefully reviewed the evidence. It is a fundamental of judicial review that an appellate court will not substitute its judgment for that of the administrative agency. *Shenefield v. Sheridan County School District No. 1,* Wyo.1976, 544 P.2d 870, 874; *Wyoming Bancorporation v. Bonham,* supra. The legislature has entrusted the examiner as the sole judge with the approval of bank charters and the weight and sufficiency of evidence supporting the application is for him to decide and he has expertise in the field. *Wyoming Bancorporation v. Bonham,* supra. We cannot lightly disregard his findings.

Surveys by the examiner and the applicants show a public feeling of need for another bank in the community and this is supported by the evidence of a substantial volume of business and individual deposits placed by local citizens with banks in other communities. The purpose of the law requiring the examiner to investigate and determine the convenience and needs of the community for an additional bank is not to protect the protestant's monopoly nor to just let the applicants become bankers for

the fun of it. The entry of a new bank into the community must be fully justified on the basis of public need.

The state examiner peculiarly possesses the qualifications, background, experience and expertise in the functioning, operation and regulation of the state banking system. We could not easily set aside that consideration. We have not only that respect for his judgment but our examination shows that we could ourselves hold no different view. It is often said that even though we might have reached a different result, had we been the fact finder in the first place, that is not important because where reasonable minds can disagree, the agency charged with making an administrative determination should be upheld. *L. L. Sheep Company v. Potter,* 1950, 67 Wyo. 348, 224 P.2d 496. We cannot set up ourselves as some sort of a super state examiner.

The applicants present a question to which we must give attention. When the petition for review was filed, apparently the protestant, by oversight or otherwise, named only the examiner. If there was a purposeful intent to preclude the applicants, such an intent could not succeed and is a demonstration of extreme discourtesy at the very least. The applicants were the most concerned parties at the administrative hearing level. It is an expensive and long drawn-out ordeal and the protestant has taken every opportunity to raise every possible question, which is its right. The granting of the application has been in the making ever since August, 1973, when the application was filed.

Here, the petition for review was filed on January 3, 1975. The first official notice the district court had that all parties may not have been served with copies of the petition was by the examiner filing a motion to dismiss petition or for order requiring joinder of parties on March 21, 1975. On May 27, 1975, the protestant filed a memorandum brief with the district court to which was attached a new certificate by protestant's counsel showing service of the petition on applicants' counsel, apparently antedated to January 3, 1975. Also at-tached to the brief was a copy of a letter from the examiner to counsel for applicants, by which a copy of the petition for review was forwarded. Additionally, on May 27, 1975, the protestant moved the district court for an order adding the names of the applicants to the petition as defendants or appellees. The district judge on June 13, 1975, entered an order denying the motion to dismiss and directed joinder of the applicants.

Rule 72.1(c), W.R.C.P., provides in pertinent part that: "Copies of the petition shall be served without unnecessary delay upon the agency and the *parties* in accordance with Rule 5." (Emphasis added.) Protestant unconvincingly argues that its original view was that "the only proper parties to a review of an administrative agency decision were the people contesting that decision and the decision maker."

■ There need be no resort to Rule 19, W.R.C.P., dealing with joinder of parties. This is an appellate matter, not an original action in the district court to which that rule applies. The general rule is that all parties prevailing, interested in having the ruling appealed from sustained and whose interest will be necessarily affected by a reversal, must be served and the appellate court does not acquire jurisdiction until that is done; all parties in interest must be given an opportunity to be heard before the court will or can proceed to a decision upon the merits of the case. *Pioneer Canal Co. v. Akin,* 1920, 27 Wyo. 88, 192 P. 680, reh.den. 193 P. 734; *Wyoming Hereford Ranch v. Hammond Packing Company,* 1924, 31 Wyo. 31, 222 P. 1027.

■ Neither Rule 72.1 nor Rule 5, W.R.C.P., provide an exact time for service after filing a petition for review. The only provision in that regard is that copies be served "without unnecessary delay." There is no valid reason why service cannot be made concurrently with filing. There may be some exception but it should not exist except in rare instances.

While we are going to accept the district court's order allowing joinder of the appli-

cants as properly named parties to the administrative appeal to that court, as inferring the good faith of counsel in making a late certificate of service several months afterwards, we find it somewhat inconsistent with the statement in protestant's brief filed with this court that at the time of filing the petition for review, it was under the impression that "the only proper parties to a review of an administrative agency decision were the people contesting that decision and the decision maker." During the course of our study of the transcript, we did discover an occasion when protestant's counsel had failed to favor applicants' counsel with a copy of an important communication directed to the examiner. On the other hand, we do not find that applicants ever complained of not receiving a copy of the petition for review.

We do not consider the position of the examiner and the applicants frivolous, as represented to the district court in protestant's citation of *Board of Trustees of School District No. 3 in Natrona County v. District Boundary Board of Natrona County,* Wyo.1971, 489 P.2d 413, supplemented by 489 P.2d 1393, where under an entirely different set of circumstances, this court admonished counsel against raising frivolous objections to service of a notice of appeal. Were it not for the district court's order to which we have referred, we might be inclined to hold there was defective service fatal to the appeal.

Affirmed.

GUTHRIE, C. J., and THOMAS, J., joined in opinion of RAPER, J.

McCLINTOCK, Justice, dissenting, with whom ROSE, Justice, joins.

I dissent from the affirmance of the state examiner's decision to issue a bank charter and would remand the proceedings to him for further consideration of matters which I believe are relevant and material to exercise of an informed discretion. I would also

direct that he make specific findings of fact as contrasted with the ultimate and to me vague findings set forth in his present decision. In doing this I expressly disclaim any intention to interfere with his statutory role as "sole judge as to whether or not a charter shall be granted," § 13–44(c), W.S. 1957, C.1965, 1975 Cum.Supp., or in any way to second-guess his determination of the facts, but I believe that this court is legally required to determine if he has complied with the mandate of the same statute that he "inquire into * * * the convenience and needs of the community to be served by the proposed corporation." As I view the record, the examiner has arbitrarily and therefore improperly excluded from his inquiry " 'facts and circumstances relative [thereto] * * * which upon due consideration may be of persuasive weight in the exercise of its discretion,'" *Lake De Smet Reservoir Company v. Kaufmann,* 75 Wyo. 87, 292 P.2d 482, 486 (Wyo.1956) (quoting from 42 Am.Jur., Public Administrative Law, § 148, No.6), and he has failed to make proper findings as required by § 9–276.25(p), W.S.1957, 1975 Cum.Supp.[1] of the Wyoming Administrative Procedure Act. These omissions require rejection of his decision without denigration of his role as final adjudicator of the conflict.

My approach to this case is essentially the same as set forth at length in my dissent in *Wyoming Bancorporation v. Bonham,* 527 P.2d 432, 440 et seq. (Wyo.1974), and I shall not engage in unnecessary repetition of those views. Basically, my view is that the state examiner, in his prosecution of the inquiry mandated by statute as a prerequisite to exercise of his discretionary judgment whether to issue a charter, has two courses of action: first, to make his own investigation, and, second, to hold an evidentiary hearing. In his independent inquiry he may seek information from any source so long as that information is made available to the contesting parties for their

---

1. Section 13–44(c) directs that a public hearing, mandatorily required if five persons so request, or which may be held on the examiner's own motion, shall be conducted "in accordance with the Wyoming Administrative Procedure Act." (§§ 9–276.19 to 9–276.33, W.S.1957, 1975 Cum. Supp.)

scrutiny, analysis and argument. The contested hearing must be fairly and impartially conducted as any other administrative proceeding, § 13–44(c), supra, § 9–276.19 et seq., W.S.1957, 1975 Cum.Supp. This includes the right of any interested party to present all relevant and material evidence consistent with § 9–276.26, W.S.1957, 1975 Cum.Supp. The examiner then considers all the information received from these two sources, weighs it, and reaches a judgment decision as to whether the charter shall issue. As required by § 9–276.28, W.S.1957, 1975 Cum.Supp., he sets forth his findings of fact and on the basis of those findings arrives at a reasoned conclusion for the issuance or denial of the charter.

To me, then, the legal test is whether the examiner has pursued all reasonable lines of inquiry, subjected the results of his own investigations to probing and rebuttal by interested parties, and reached a decision based upon that evidence. If he has conducted all of the preliminaries in a fair and reasonable manner then he has complied with the law, and the interpretation he places upon or the conclusions he draws from those facts as found by him are not subject to reappraisement in the courts. In other words, we do not sit as trier of the facts, we do not determine the need and convenience, we do not interfere with his exercise of judgment.

The protestant's claim that with the conclusion of the first evidentiary hearing the examiner was as a matter of law powerless to make any further independent investigation or to receive further evidence in a reopened hearing is as unacceptable to me as it is to the majority. The statutory duty imposed upon him is to "inquire." I believe this to be a serious and important task, and if its performance is to have any validity it must be because the examiner will make all indicated inquiries and seek all facts that will have a bearing upon the merits of the application and the need of the community for the additional service. I can find noth-

ing in the statute that indicates that the inquiry will be conducted only to that point when the examiner declares the evidence closed. I find no prohibition against his seeking further information upon his own initiative or reopening the hearing to receive further evidence. The limitations upon his inquiry advocated by the protestant might very well lead to an uninformed and therefore ill-advised decision, inimical to the public interest and need. It therefore necessarily follows, I think, that the duty to inquire continues until the examiner has sufficient facts upon which to reach an informed and advised decision upon the question.

My difference with the majority, then, lies with their apparent willingness to concede the right of the examiner to take additional evidence, whether through his own investigation or through testimony; but at the same time to approve what I consider to be the unreasonable strictures which he placed upon the further proceedings. If it appears that he has himself deliberately limited his inquiry into the facts, whether by improper limits on his own investigation or by imposing narrow limitations upon the evidence which may be considered at any hearing, be it the original or reopened hearing, in my opinion it follows that he has not carried out his statutory duty, has not sought fully to inform himself and thereby has led himself into "unreasoning action, without consideration and in disregard of facts and circumstances." *Marathon Oil Company v. Pan American Petroleum Corporation*, 473 P.2d 575, 577 (Wyo.1970).[2]

I believe that the statutory duty to inquire, whether the instigation comes from the examiner himself or from an interested party, is not satisfied so long as material information is or reasonably may be considered as lacking at the time the decision is made. Such a view imposes no great burden upon the examiner and we should not consider such an inquiry subject to the same limitations placed upon presentation of ad-

---

**2.** See further discussion and citation of authority in *Wyoming Bancorporation v. Bonham*, supra, 527 P.2d at 440 (dissent).

ditional evidence in court trials. As recognized by the majority, the examiner is here exercising a special statutory obligation and our purpose should be to insure that the purpose of that obligation is fulfilled.

I do not mean to say that there is no limit at all upon the time and attention which the examiner must devote to this problem. It is not necessary that he reopen the hearing for every offer of evidence, however lacking in probative value it may be. Those are matters which he must weigh, subject to review of his action in the courts, bearing in mind that all investigations and proceedings must come to an end at some time so that without undue delay the examiner may decide for or against the issuance of the charter. But I say that he is not playing a game within strict time limits. The examiner had closed the original hearing on March 5. He expressed no concern about time when on April 11 he reopened his own investigation, or on August 16 when he gave notice of reopening the hearing on October 1.[3]

While I do not agree with appellant that the refusal of the examiner under the circumstances of this case constituted a denial of due process I do think that it was arbitrary and amounts to an abuse of discretion. Counsel for appellant during that reopened hearing first sought on cross-examination of the senior examiner to ascertain whether he might have considered other questions, but was prevented from exploring this when the state examiner held that

such questioning did not relate to data which was in the public file, that is, the senior examiner's report of his supplemental examination.[4] Counsel later tried to go into matters which appear to me to have been relevant and material on the question of the convenience and needs of the community to be served by an additional bank, explaining his reasons for the attempt and making offers of proof disclosing the materiality thereof. It does not appear that these offers were rejected because the examiner determined that the offered evidence was not material, or that it could not affect the answer to the question of need, but only because the examiner, at the time he reopened the hearing and without knowledge as to what evidence might be tendered on that question of need, had foreclosed any further inquiry except to ascertain why there was a discrepancy in opposing evidence as to out-of-town banking.[5] I do not say that this evidence, even if offered at the original hearing, would have been sufficient to establish the lack of need for the bank, but I say that at whatever time it was offered, it was the legal duty of the examiner, in the exercise of his sole power to render judgment, to listen to, consider and weigh the evidence offered. I think the record is clear that the examiner was confining his inquiry as to the need for a charter to a point in time some six months previous. I simply cannot accept this as a proper discharge of his continuing duty to inquire. He is required to issue or deny a

---

**3.** Later advanced to September 24. In the notice it is stated that "it is the determination of the State Examiner that no information or evidence will be considered other than that which will directly support or rebut the additional data gathered by the Senior Bank Examiner. The Applicant and the Protestant will each be given one and one-half ($1\frac{1}{2}$) hours in which to challenge or support the findings under consideration."

**4.** Attempts of appellant's counsel to inquire why certain areas were selected for inquiry while others were not were objected to and sustained. It was elicited that the senior examiner's supplemental investigation had not considered current population, Thermopolis deposits in Worland banks, satisfaction with the bank in the community, income trends in the

county compared to other counties, and had not checked information elicited by questionnaire as to the size of accounts against FDIC data to see if such account size was credible. There had been no reexamination of management. These exclusions appear to have resulted because of the limited nature of the task assigned by the examiner.

**5.** Attempts of appellant to show that deposits in the established bank in Thermopolis had dropped between the first and second hearings were rejected for lack of pertinence to the reopened hearing. According to an offer of proof four banks in Wyoming had lost deposits during the period in question and appellant had suffered the greatest loss, a drop of some $800,000 in demand deposits and an overall drop of some $100,000.

charter on conditions as they exist at the time of his decision.

One more thing leads me to conclude that the examiner has acted in an arbitrary manner. The majority properly point out that appellant does not object to the form of the findings but it clearly objects to three very material findings. I agree with appellant that the examiner's finding that the prevailing view of Thermopolis citizens is that a second bank is "desirable" is nothing but an ultimate conclusion and would also point out that the question posed by the statute for the examiner to answer is not whether there is desire for another bank but whether such bank is needed and will serve the interests of the community. I am also inclined to agree with appellant that the finding that "a substantial volume of business and individual demand deposits are now leaving the community by way of deposit accounts placed with banks located in other communities" is an ultimate finding but more importantly would point out that there is no finding, ultimate or specific, that establishment of another bank in Thermopolis would result in a return of those deposits. The examiner's finding that the proposed bank would give better banking service by providing needed competition and "by generating additional deposits thereby increasing the total volume of deposits and funds available for lending with-in the community" is not only an ultimate finding, perhaps an ultimate conclusion on the question to be answered by him, but is without support in any specific findings by the examiner. Since quite a number of the people queried maintain accounts in both the Thermopolis bank and an outside bank, I have a strong disinclination even to imply a finding that any material percentage of those people now maintaining accounts outside Thermopolis would use the new bank. This would be a material part of any findings by the examiner granting a new license. Without such a specific finding it is impossible for me to find any factual basis how the new bank would increase the total deposits in the community.

I would therefore remand the proceedings to the examiner with directions to hold another hearing, permitting introduction of all information pertinent to the need of the Thermopolis community for another bank and thereafter to enter specific findings of fact upon which the question of whether a new bank is needed in Thermopolis would then be answered.