In the Matter of the Parental Rights to X, Y and Z.

DS and RS, Appellants (Respondents below),

v.

DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Sheridan, Wyoming, Appellee (Petitioner below).

No. CF 2.

Supreme Court of Wyoming.

March 6, 1980.

Rehearing Denied March 26, 1980.

by appellants to demonstrate compliance with §§ 17–1–201, et seq., esp. §§ 17–1–205 and 17–1–206, W.S.1977.

912

Michael K. Shoumaker, of Badley, Rasmussen & Shoumaker, P. C., Sheridan, for appellants.

Thomas C. Wilson, County and Prosecuting Atty. for Sheridan County, Wyoming, for appellee.

Kim D. Cannon, guardian ad litem for X, Y and Z, of Burgess & Davis, Sheridan, filed a brief and appeared in oral argument.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

Where is there a more sensitive place in the law than that area where courts must undertake to decide whether or not a child will be taken from its mother? We know of none. That is the issue in this appeal. This is a contest for custody of a child, X, between the child's natural mother, DS, and her husband, RS, on the one hand, and the State Department of Public Assistance and Social Services (sometimes referred to as D–PASS), on the other hand. In reversing the trial court's termination of parental rights, we will:

(1) Hold that tardy service of the notice of appeal is, in this instance, not fatal;

(2) Establish standards for evaluating abuse or neglect sufficient to terminate parental rights; and

(3) Construe as interlocutory a 1978 court order which conditionally provided for termination of parental rights.

### FACTUAL OVERVIEW

This case was commenced on April 3, 1978, in the District Court at Sheridan, Wyoming, when the county attorney petitioned the court to terminate the parental rights of appellants, DS and RS, with respect to three-year-old child X on the statutory ground of neglect. The petition also sought termination of DS's and RS's parental rights with respect to twin children Y and Z. While this appeal concerns only X, the treatment of the twins was admitted as evidence of the parental unfitness of DS and RS. We will treat sparingly with the issue of parental interplay between the appellants and children Y and Z, since the issue tends to border on the irrelevant to any questions properly before us.[1]

X was born to DS when she was 15 or 16 years old and unmarried. RS [2] is neither

---

1. The twins were sickly and therefore their parental requirements were different than those of child X. A comparison between the relationship which existed between the appellants and the twins and that which existed between the appellants and child X is not altogether apt.

2. It is not clear to us what, if any, parental rights RS claims in X, thus our reversal is not to be construed as decreeing that RS has any such parental rights. (The 1978 order terminated the parental rights of DS with respect to X. The 1979 order terminated the parental rights of both DS and RS with respect to X. Both DS and RS have appealed.)

the natural nor adoptive parent of the child. For the first two years of his life, X lived with his mother and grandmother. During this time, DS was married for a short time and while she was so occupied X lived mostly with his grandmother. When this marriage terminated, DS returned to reside with her mother and with X. Sometime in 1977, DS married RS, and DS and X left the home of DS's mother to make their home with RS. In November of 1977, the twins, Y and Z, were born.

On April 13, 1978, temporary custody of the three children was awarded to the Sheridan County Department of Public Assistance and Social Services. Trial, initiated by the county attorney's petition to terminate parental rights, was had and, on July 6, 1978, the district court used language which appellees and the guardian ad litem argue had the effect of awarding permanent custody of the three children to D–PASS. However, this same order further provided that the court would allow a review of its decision within one year. No appeal was taken from this order.

In May of 1979, DS and RS moved the court for a review of its July 6, 1978, decision. In the hearing on the motion, DS and RS waived whatever rights they had to seek reconsideration of termination of parental rights with respect to Y and Z because they required medical and other special treatment which appellants felt they could not provide. The movants did seek, however, to prove that their situation had improved— that the State had not and could not show that X had been neglected and they they were fit to have custody of this child. The district court, having heard the evidence on these issues, ordered that the parental rights of DS and RS be finally terminated. This case comes to us on appeal from that decision.

### THE ISSUES

Appellants DS and RS, as well as appellee-D–PASS, limit their statement of the issues to the question of whether or not the evidence justified the district court's termination of the parental rights of DS and RS and its refusal to modify that decision. X's guardian ad litem, who sides with D–PASS, raises two other issues which call for our attention: The guardian argues that the court should dismiss this appeal because service of the notice of appeal on the guardian ad litem was defective. The guardian also urges that the district court's 1978 order was a final order which terminated all parental rights as between X and his mother and RS, and, since there was no appeal from this order, there can be no issue of terminating parental rights properly before the court at this time.

### SERVICE OF THE NOTICE OF APPEAL

Although the appellants timely filed a notice of appeal, the guardian ad litem was not served with this notice and did not learn of it until a week later. He has not, however, shown any prejudice to his handling of the appeal arising from his failure to receive timely notice. The guardian argues that under Rule 2.01, W.R.A.P.[3], an appeal is not perfected unless the other parties are served with the notice. He goes on to say that even though failure to properly serve the other parties may not be a jurisdictional defect it is, nevertheless, a violation of the rules which will and, in this case, should justify dismissal of the appeal. Appellants answer with the argument that service upon the guardian ad litem is not necessary to perfect the appeal and the defect should be forgiven. We hold that failure to timely serve notice of appeal upon a necessary party is not a jurisdictional defect which automatically requires dismissal and that the circumstances of this case do not warrant dismissal of this appeal.

Rule 1.02, W.R.A.P., says:

> within fifteen (15) days from the entry of the judgment or final order appealed from and serving the same in accordance with the provisions of Rule 5, W.R.C.P., unless a different time is provided by law, . . . ."

**3.** The relevant part of the rule is:

"An appeal, civil or criminal, permitted by law from a district court to the Supreme Court, shall be taken by filing a notice of appeal with the clerk of the district court

"The timely filing of a notice of appeal is jurisdictional. The failure to comply with any other of these rules or any order of court does not affect the validity of the appeal, but is ground only for such action as the reviewing court deems appropriate, including but not limited to citation of counsel or a party for contempt, refusal to consider the offending party's contentions, assessment of costs, or dismissal or affirmance."

Rule 1.02 means that failure to timely file a notice of appeal is an incurable jurisdictional defect. However, jurisdiction of this court to the appeal itself is not obtained simply by filing a notice of appeal. Jurisdiction of the appeal, according to Rule 3.01, W.R.A.P., is obtained when the record on appeal is filed. Notions of elementary fairness, as well as our case law, require that

"... all parties prevailing, interested in having the ruling appealed from sustained and whose interest will be necessarily affected by a reversal, must be served and *the appellate court does not acquire jurisdiction until that is done* ; all parties in interest must be given an opportunity to be heard before the court will or can proceed to a decision upon the merits of the case. ..." (Emphasis supplied) *First National Bank of Thermopolis v. Bonham*, Wyo., 559 P.2d 42, 50 (1977).

Reading the rule of the above case, as well as Rule 3.01, supra, *in para materia* with Rule 1.02, supra, we conclude that there are certain appellate obligations which must be discharged before this court acquires jurisdiction, but it does not follow that the tardy observance of all of these requirements will automatically result in dismissal of the appeal.

Although the *First National Bank of Thermopolis* opinion, supra, predates the adoption of the Wyoming Rules of Appellate Procedure and concerns an administrative appeal to the district court, its result is in accord with the above interpretation of Rule 1.02, supra, as the *First National Bank of Thermopolis* opinion relates to the failure to properly serve a party with a notice of appeal. In the bank case, this court chastised the appellant's counsel for failing to timely serve upon one of his opponents his petition to review the administrative proceedings. We indicated that the defective service could have been held fatal but declined to dismiss the appeal and, instead, held that the defective service was a good-faith mistake which had been cured. *First National Bank of Thermopolis*, supra, at pp. 50–51.

In the matter here for decision, we have noted that the guardian ad litem does not show any prejudice by reason of the fact that a week elapsed before receiving notice of the appeal. Appellants' counsel represents that he inadvertently failed to serve the guardian. In view of the lack of prejudice to the guardian ad litem, the relatively short delay between filing and serving him (cf., the delay of several months in *First National Bank of Thermopolis*, supra), and the apparent good faith of appellants' counsel, we will exercise our discretion to reach the merits of this important case. We do so with the admonition to all concerned that failure to serve notice of appeal upon all parties contemporaneously with the filing of the notice may, and probably will, in most cases, result in dismissal of the appeal.

### EFFECT OF NOT APPEALING THE 1978 ORDER

In pertinent part, the July 6, 1978, order provided:

"IT IS ... ORDERED that the parental rights of _____ [DS] ... are hereby terminated and the said minor child is hereby placed in the permanent care and custody of the Department of Public Assistance and Social Services of the State of Wyoming.

"IT IS FURTHER ORDERED that the parents ... may petition this Court for a review and reconsideration of its decision One (1) year from the date of this Order."

This writing is, on its face, internally contradictory. If the order is interpreted as having awarded "permanent care and cus-

tody" to the State, one obvious result would be that the State would have been free to allow adoption. Had this kind of finality been the intention of the court, there would be no possible purpose to be served by inserting language which authorizes a "review and reconsideration of its decision" within a year. On the other hand, if the court's order is intended to be conditioned upon that which may flow from a subsequent hearing, then the 1978 order cannot be said to have severed the parental relationship between DS and X.

If it were to be concluded that the 1978 order was a final order which permanently terminated parental rights and awarded custody to the State, then the case law of other jurisdictions strongly suggests that an appeal from a subsequent custody-modification hearing will not substitute for an appeal from the original custody proceedings.[4]

The guardian argues that the second above-quoted paragraph of the 1978 order is without force and effect, in support of which he cites § 14–2–307(c), W.S.1977, from the article on termination of parental rights. That subsection states:

**4.** E. g., the Oregon Supreme Court has made it clear that a custody modification proceeding is not a vehicle for relitigating the underlying custody proceeding. In *Marriage of Greisamer*, 276 Ore. 397, 555 P.2d 28, 31, fn. 3 (1976), the court said:

"...[T]he decision in the prior proceeding would be res judicata in a subsequent modification proceeding, assuming that there was no evidence of a change in circumstances after the original decree.[3]

"[3]Even assuming that a change in circumstances is shown, undue relitigation of the same factual issues will be minimized by the exclusion of irrelevant evidence from the distant past and by the application of the doctrine of res judicata to decided controversy. Where, for example, the original decree contains an express finding of fact of child abuse by the mother, the truth of this finding could not be re-litigated."

**5.** In this connection, we observe that in 1965 the legislature amended § 14–2–307(c), W.S. 1977, to its present form from its original form which required that every order is conclusive and binding *six months* from the date of entry. Ch. 169, 1955 S.L. of Wyoming, and Ch. 67, 1965 S.L. of Wyoming. This suggests a legislative directive that the trial judge *not* do what he did here—keep the child's future dangling in limbo with the result that, in this case, X has

"Every order is conclusive and binding from the date of entry."

We have previously held that the state has power to regulate the termination of parental rights in proper cases and upon valid grounds. *Matter of C. M.*, Wyo., 556 P.2d 514, 517 (1976). It is within the legislature's power to enact a statute requiring that an order terminating parental rights be final and not subject to reconsideration within a year. However, we cannot agree with the guardian that § 14–2–307(c), supra, is controlling as we seek to interpret the trial judge's contradictory 1978 order. In this case, we must concern ourselves with what the trial judge *did*, not with what he *should have done*. This does not mean we approve of what the judge did.[5]

The literal language of the order suggests that it is inconclusive—that it does not undertake to finally sever the parental relationship between the child and its mother. The guardian seemed to admit this where he said in oral argument to this court (Tape of argument, Side B at 95–97) that the language of the 1978 order allowing for reconsideration within a year "prevented [X's] adoption as a matter of fact." The guardian thus finds himself taking contradictory positions where, on the one hand, he concedes that the 1978 order was inconclusive so as to prevent adoption, while at the same time arguing that the order was con-

been forced to adjust to two foster homes and now will be forced to adjust back to his original home.

However, in fairness to the trial judge, we should point out that this apparent legislative directive is somewhat muddied by language in § 14–2–307(a), W.S.1977, which begins with the phrase, "Upon the petition of any *parent* . . . ." (Emphasis supplied). Section 14–2–304(a), W.S.1977, provides that a proceeding to terminate parental rights can be commenced by the county attorney or any interested person. In its original form, Ch. 169, 1955 S.L. of Wyoming, the section providing for conclusiveness of an order (§ 6), is distinct from § 5, which provides, "Upon the application of any parent . . . .," and § 2, which allows the county attorney or any interested person to commence the action.

clusive so that the natural mother has forfeited fundamental rights by not appealing the order. Confronted with a very similar case, the Supreme Court of Alaska ruled that the disputed order had the effect of awarding temporary custody only. *Britt v. Britt,* Alaska, 567 P.2d 308 (1977).

■ We conclude that the 1978 proceeding was in the nature of a temporary hearing and the order emanating therefrom must be considered as a temporary order. Taken in this context, it follows that that order did not intend that the parental rights of the appellants should be permanently terminated. We construe the 1978 order as interlocutory and one which effectively awarded *temporary* custody of the child to the State, while reserving to the court the right of *final* decision-making for a period of one year. Accordingly, the failure to appeal the 1978 order does not prevent the appellants from disputing the evidentiary basis of the final 1979 order.

WAS THE DISTRICT COURT JUSTIFIED IN DEPRIVING APPELLANTS OF CUSTODY OF X?

### *Defining the Standard*

The termination-of-parental-rights statutes under which this action was brought, §§ 14–2–301 to 14–2–307, W.S.1977, provide in part:

"Any parent who abandons a child . . . or abuses or neglects a child may have his permanent care, control and custody of the child transferred to some other person, agency or institution and may have all his parental rights to the child terminated." § 14–2–301.

However, § 14–2–306, W.S.1977, provides:

"(a) After the hearing, if the court determines it is in the best interest of the child that parental rights of his parents be terminated, the court shall appoint a suitable person to serve as guardian of the child.

"(b) If any child is abandoned, neglected or abused by one (1) parent, only the rights of the parent at fault may be terminated."

At the outset, this presents us with a problem of statutory construction: How do we harmonize the "best interest" language of § 14–2–306(a) with the abandonment, abuse or neglect standards of § 14–2–306(b) and § 14–2–301? (Section 14–2–307(a) also contains best-interest language but is prefaced with the phrase, "upon petition of any parent. . . ." See fn. 5, supra.)

■ We believe that the best-interest language must be read in *para materia* with the abuse, neglect or abandonment standard. This means, for example, that if the State seeks to terminate parental rights because of neglect, the State must show that the interests of the child require termination of the parental rights in order to protect the child from neglect. It will not do for the State to fail to prove neglect but to argue that the natural parents, because of a low socio-economic standing, cannot provide the child with all the advantages that more affluent, better-educated foster parents could provide. This conclusion follows from a literal reading of § 14–2–301, supra. In addition, as discussed below, federal and state constitutional considerations would also mandate this conclusion.

However, we are still left with a difficult question. Because this case involves a challenge to the sufficiency of the evidence to support the trial judge's finding, we must resolve the question of what standard is used to determine if the natural parent has abused or neglected her child, so as to justify and require termination of parental rights in order to protect the child's interests.

This issue was before us in *Matter of C. M.,* supra, at 556 P.2d 518; and see *In re Shreve,* Wyo., 432 P.2d 271 (1967). However, we did not, in those appeals, undertake to define the standard against which a claim of parental abuse or neglect will be examined. Because of the extremely delicate nature of parental-rights-termination matters, we seize upon this opportunity to establish, for bench and bar, guides and standards which will, hopefully, point the way in this and future cases.

The Termination-of-Parental-Rights statutes do not define abuse or neglect. However, elsewhere in Title 14 the legislature has defined abuse:

"§ 14–3–202. Definitions.

"(a) As used in W.S. 14–3–201 through 14–3–215: . . .

"(ii) 'Abuse' means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law.",

and neglect:

"(vii) 'Neglect' means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being. Treatment given in good faith by spiritual means alone, through prayer, by a duly accredited practitioner in accordance with the tenets and practices of a recognized church or religious denomination is not child neglect for that reason alone;"

■ In addition, we are helped in our task by a large body of state and federal constitutional law defining the interests individuals have in their family associations. The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (integrity of the family unit protected by the due-process clause of the Fourteenth Amendment); and *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (implication that liberties guaranteed by the federal constitution are fundamental). See, also, *State ex rel. Heller v. Miller*, 61 Ohio St. 6, 399 N.E.2d 66 (1980). Analysis of the Wyoming Constitution and case law also leads to the conclusion that the right to associate

with one's family is a fundamental liberty. Article 1, Sections 2, 6, 7 and 36, Wyoming Constitution; *Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310 (1980); *Matter of Adoption of Voss*, Wyo., 550 P.2d 481 (1976); and *In re Adoption of Strauser*, 65 Wyo. 98, 196 P.2d 862 (1948).

■ In analyzing legislative classifications, we have held that if a fundamental liberty interest is infringed the classification will be subject to strict scrutiny. *Washakie County School District Number One*, supra. See, also, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The constitutionality of the parental-rights-termination statutes is not in issue in this case and the two cases just cited are, therefore, not strictly applicable. However, it appears to us that the same considerations which require strict scrutiny of the statute require strict scrutiny of the statute's application. In other words, the trial judge trying a parental-rights-termination case must strictly scrutinize a claim of abuse or neglect or abandonment before terminating parental rights (a fundamental liberty). The trial judge is not free to terminate parental rights merely because the State or other petitioner shows that it is more probable than not that the natural parent is abusing or neglecting the child.

We have not found support in the case law for a standard cast in terms of "strict scrutiny." However, where courts have undertaken to terminate the parent-child relationship, the scrutiny has, to say the least, in fact been strict.

In *Matter of Adoption of Voss*, supra, and *In re Adoption of Strauser*, supra, we were called upon to determine if, as a matter of law, the natural father could be said to have abandoned his child or children. In *Voss*, we said:

". . . [A]doption statutes are strictly construed when the proceeding is against a non-consenting parent and every reasonable intendment is made in favor of that parent's claims . . .

"There is a reason for that tenet. Paraphrasing . . ., the earliest and most hallowed of the ties that bind humanity, in all countries considered sacred, is the relationship of parent and child. . ."
550 P.2d at 485.

In *In re Adoption of Strauser*, supra, we held that the welfare of the child (his best interests) is a question which should not be reached until parental abandonment is actually proved. 196 P.2d at 868.

Similarly, the United States Supreme Court recently observed:

"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' [Citation omitted.]. . . ." *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978).

See, also, *Linn v. Linn*, Neb., 286 N.W.2d 765 (1980).

It may be that in matters such as this, lawyers, judges, parents—all of us—should digress from the ordinary course of things to contemplate how deeply seated the child-parent relationship is in the warp and woof of the American fabric. In this matter, where the law must decide whether a child will be separated from his mother, we have looked to the Declaration of Independence for guidance. We find the following familiar language to be helpful:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their powers from the consent of the governed, . . . ."

While no complete listing of the "unalienable rights" endowed upon us can be easily defined—it is not, we suggest, too fantastic to assume that the rearing of our children might be one example of the pursuit of happiness that the founding fathers envisioned. If we accept this hypothesis, then it becomes important to recognize that the rights described in both the state and federal constitutions were formulated to protect the Declaration of Independence. This surely adds significance to the strict-scrutiny concept in matters affecting the rights of parents to rear their children.

In view of the above authorities and reasoning, we hold that a court may not terminate parental rights because of abuse or neglect unless the abuse or neglect renders the parent unfit in the context that such abuse or neglect poses a serious danger to the child's physical or mental well-being, i. e., clearly detrimental to the child. Thus, for example, punishment which may seem severe but which does not harm, is not such abuse as will suffice under § 14–2–301 to terminate parental rights. Similarly, slovenliness in keeping a young child clean or his home in good order may offend many of us and may, by some, be characterized as neglect, but is not such neglect—assuming no serious health effect or risk—as will justify termination of parental rights.

We admonish that the burden of proving neglect or abuse is upon him who seeks to take the child from the parent. We emphasize that the trial court and the appellate court will strictly scrutinize claims that a natural parent is unfit because of abuse or neglect. This means that the court's duty to protect the child will be balanced against its duty to protect democratic values. It means that termination of parental rights cannot be ordered on the grounds of abuse or neglect unless the showing is clear and unequivocal that the child's health—mental or physical—and/or his social or educational well-being has actually been placed in jeopardy through the neglect or abuse by the parent.

*The Facts of This Case*

In reviewing the facts of this case to ascertain if the standards above discussed have been met, we do so with all of the applicable appellate directives in mind, which include these rules: We will

examine the evidence in the light most favorable to the appellee and will resolve all conflicts in evidence for the appellee. *Gray v. Fitzhugh*, Wyo., 576 P.2d 88 (1978). We will assume the evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn from it. *Hammer v. Town of Jackson*, Wyo., 524 P.2d 884 (1974); *Mellor v. Ten Sleep Cattle Co.*, Wyo., 550 P.2d 500 (1976); *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976); and *Douglas Reservoirs Water Users Ass'n v. Cross*, Wyo., 569 P.2d 1280 (1977).

A D–PASS social worker who saw X on several occasions when he was with his mother at the D–PASS office testified that sometimes X was clean; sometimes there was dirt around his face and hands and his clothes were not always clean. This witness visited the home and found it in disarray and smelly because of stacks of waste that had not been removed. On another occasion, this witness found the disarray to be creating a fire hazard. A later visit to the home by this witness led to the conclusion that it had been cleaned up. He testified that the twins were soiled and there was matter in their eyes, milk on their faces, and their hands had dirt underneath the fingernails. This witness said that after the twins were moved to a foster home they were cleaner. X had diarrhea, but this cleared up in the foster home. X was happy, more responsive, and was toilet trained while in the foster home. The witness did not know what caused X's unresponsiveness. The mother, he said, did not talk a lot to her children.

Another witness, an employee of D–PASS, saw X at the D–PASS office with his grandmother. He seemed more withdrawn after the birth of the twins. She did not observe him interacting with other children or elders—he did not talk as well as he should for his age. After moving to a foster home, X seemed cleaner, happier and more verbal. The improvement that this witness observed in his foster home could

have been due to the removal from his life of rival siblings. She testified that the mother was resistant about placing and keeping X in a day-care center.

Another witness, an employee of D–PASS, testified that the mother did not like the social worker and was reluctant to accept help. She confirmed other witnesses' opinions that the house was unkept. On one occasion when she visited, the mother was in bed; X had the flu and was with his grandmother. She observed the boy spoke poorly and observed a lack of interaction between the boy and his mother. She had not recommended a speech therapist to X's mother.

The State called a pediatrician who had treated X for respiratory infection, gastroenteritis, and stomach flu. He testified that X had not been given all of the recommended childhood immunizations but did not know if X was caught up. He said the mother sometimes kept the children's appointments—sometimes did not—and sometimes called without an appointment. He observed the type of bruises children commonly get but none that he would characterize as having been inflicted through punishment. He said the mother seemed "quite slow" and he had, for this reason, gone over the twins' medication schedule several times with her. The doctor testified that X was physically normal and his withdrawal after the birth of the twins could be a common jealous reaction. He had observed nothing to indicate that either of the appellants was unfit to care for X.

At one juncture, the doctor was asked, and he answered, as follows:

"Q. Dr. Knepper, do you think [X] is environmentally deprived?

"A. That's a very difficult question.

"Q. I'm not asking you if his situation could be better. I suppose most people could be better off, but is it to the point where it's endangering the child or anything like that?

"A. No, probably not."

Another D–PASS witness had attempted many visits to the home and first found the

house messy, but her later visits found improvement. She commented that "it was a big thing to have the twins in the family all of a sudden." X appeared strange at first but came to like the witness. He was hard to understand—seldom wore shoes or socks—not really very clean but not always dirty.

A Sheridan County nurse testified that she met DS when X's maternal grandmother was undertaking much of X's care—she was concerned that X was not receiving normal immunization shots—X's speech concerned her and X had a toilet-training problem. X was given a developmental screening test in Denver when he was three years old and tested well, except that his speech was deficient. She observed that X was closer to the grandmother than he was to his mother. The mother did not seem motivated to give medication to the twins on time. The weeks when the twins first arrived were difficult for DS because it was then that her mother was in the hospital and she had all those responsibilities come to her at once. The nurse was not sure that baby bottles were being properly sterilized and DS was observed transferring bottles from baby to baby.

The nurse testified that both DS and her mother told her that DS's husband, RS, beat or spanked X when he messed his pants. (Up until this point, all the other witnesses had disclaimed knowledge of any beatings.) Asked about the term "beating," the nurse replied, "I must assume they meant spanking because [X] showed no evidence of being abused physically."

The next witness was LT, X's foster parent at the time of the 1978 hearing. X was shy upon entering the LT home and "seemed like an intimidated child." His diarrhea cleared up within a week after he was taken off milk and milk products. Spanking wasn't effective in toilet training so other methods were tried and toilet training was accomplished. During his stay in the foster home, X became more affectionate. His speech improved. LT thought

it odd that the child didn't cry, even when being spanked. He seldom talked about his mother and associated seeing his grandparents with being told that he would visit his folks.

BW, DS's mother, was called as a witness for the State. She provided much of the chronology of X's upbringing described earlier. She answered, "Yes" to the following question:

"Now, isn't it a fact that you have really done more as far as [X] is concerned in raising him than your daughter, isn't that true?

In describing what she did for X, DS's mother said:

"Just taking care of him, raising him, feeding him, bathing him, loving him, caring for him. What else is there to do?"

DS's mother also stated that DS's husband hit X once with a belt to discipline him for going too close to a creek. She described the hit as "a love pat . . . It wasn't very hard."

DS's mother also testified that X had called her "mom" for a period but was now calling her "grandma."

Asked about her care of the child during DS's first marriage, DS's mother stated that DS had not abandoned the child and stated, "I wanted her marriage to work first before she took [X], and make sure that everything was going to be all right before involving a child into the marriage."

A speech pathologist of the Sheridan County Day Care Center was called as a witness by the State. She testified that X tested somewhat behind the norm on his expressive skills. She stated, "We would guess that he needs to be talked to more. He needs to be read to. He needs to be challenged to think." On cross-examination, the witness testified that in the majority of children the expressive skills lag behind the receptive skills. (She had previously testified that X's auditory receptive skills were normal.)

At the 1979 hearing for reconsideration, the State called PW, X's current foster mother. She testified that X was docile and had language problems when she first started caring for him on September 14, 1978. He also had bed-wetting problems. She reported a significant improvement in these areas during the time that X was with her and her husband. PW conceded that she didn't know if X's problems were the fault of DS or were due to the fact that X had been moved around so much. She also testified that X was now a normal four-year old.

The State and guardian also attach significance to the fact that DS testified that she did not give X any gifts through D-PASS, although D-PASS had given her this opportunity. However, DS also testified that her relationship with D-PASS was quite strained after the 1978 hearing.

### Discussion

 Accepting the State's evidence in its entirety, we are unable to say that the State has established abuse or neglect sufficient to show that DS is an unfit parent. We are disturbed that DS delegated a great deal of her parental duties to her mother. However, we think it appropriate to quote from *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 504–505, 97 S.Ct. 1932, 1938–39, 52 L.Ed.2d 531 (1977):

> " . . . The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition . . . Especially in times of adversity, ·. . . the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life. . . . "

Grandparents traditionally have often had important roles in rearing their grandchildren. Just because a grandparent assumes a dominant role in rearing a child does not by itself establish the unfitness of a parent or the State's right to terminate the parental rights.

We recognize that extreme sloppiness in keeping house can create serious fire and disease risks. However, the State has not demonstrated that sanitary and fire risks are a customary condition in the natural mother's household.

The evidence of DS's failure to properly administer medication to the twins is disturbing in view of the twins' critical need for the medication. However, this appeal concerns DS's fitness to care for a healthy child. DS's refusal to cooperate with social workers is evidence of the State's inability to correct problems without obtaining custody of X;[6] however, it is not evidence of DS's unfitness as a parent. Viewing the evidence in its entirety, we are concerned that DS and RS may not be providing X with as much affection and intellectual stimulation as is optimal. However, many parents—perhaps most of us—fall short in this respect. The issue is not whether the foster parents can do a better job than DS and RS; the issue is whether, according to the standards we have established, DS has imposed such neglect upon the child as will justify separating a mother and her child. Although the State presented evidence that X had some emotional or developmental problems which may or may not have been the result of DS's care of X, there was no evidence that the emotional problems were anything more than problems which children of that age commonly have. Indeed, the State's doctor testified that X was probably not environmentally deprived; and X's current foster mother describes him as normal. There was no evidence presented of any serious physical problems or abuse.

It would, indeed, be a sad commentary upon the law if it were unable to come to

---

6. Strict scrutiny of the application of the parental-rights-termination statutes would require that before the State can terminate the parental rights, it must show that less intrusive means of protecting the child (such as counseling the parents) have been attempted or are impractical. *Washakie County School District Number One,* supra.

the aid of an abused or neglected child *until* there was an actual manifestation of some serious damage; We do not so hold. However, if the State wishes to demonstrate that parental abuse or neglect is sowing the seeds for future problems, it must do so in a more convincing manner than it did in this case.

Under the standards established herein, we must conclude that as a matter of law neither abuse nor neglect has been established. The judgment of the trial court is reversed and remanded for issuance of an order restoring custody of X to DS.

Reversed.