In the Matter of the Interest of: ZKP, BNR, BLR, and WHR:

LDC, Appellant (Respondent),

v.

The State of Wyoming, Department of Family Services, Laramie Peak District, Converse County Branch, Appellee (Petitioner).

No. C–97–6.

Supreme Court of Wyoming.

May 14, 1999.

Corinne A. Miller, Casper, WY., for Appellant. Argument by Ms. Miller.

William U. Hill, Attorney General; Michael L. Hubbard, Deputy Attorney General; and Dan S. Wilde, Assistant Attorney General, for Appellee. Argument by Mr. Wilde.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

LEHMAN, Chief Justice.

After six years of rehabilitative efforts, including lengthy periods of foster care, the Department of Family Services petitioned for termination of LDC's parental rights to her four children. Finding that the children had been abused and neglected, the district court terminated LDC's parental rights. She appeals, claiming the termination was not supported by clear and convincing evidence.

We affirm.

### ISSUES

LDC (appellant) identifies one issue for our review:

I. Whether there was sufficient evidence to support the decision to terminate parental rights.

Appellee, Department of Family Services, (DFS) restates the issue as:

I. Whether the District Court's finding that Appellant's Parental Rights to ZKP, BNR, WHR, and BLR should be terminated was established by clear and convincing evidence?

### FACTS

Appellant is the natural mother of four children. ZKP was born February 27, 1986, when appellant was 17 years old. ZKP's father is unknown. Appellant's three other children are the issue of her first marriage. BNR was born August 22, 1988, WHR was born January 28, 1990, and BLR was born March 30, 1992.[1]

The family's first contact with DFS came in September of 1990, when WHR, who was born prematurely, was diagnosed with what the attending physician described as a "very serious case of failure to thrive." He was malnourished and required a three-week stay in the hospital. DFS organized a team of caregivers to help the young couple. Besides instruction on how to properly feed WHR, the parents were instructed about proper nutrition and how to organize meals for the entire family. The couple was also provided mental health counseling.

After a number of disturbing reports, ZKP, BNR, and WHR were taken into protective custody by DFS in December of 1990. One report indicated that the children had been left alone for three to four hours while their parents were in a bar. A babysitter reported seeing the father using a belt on ZKP because the child had wet his pants. Another report described bruises on ZKP's legs.

The children were placed in foster care, and the parents entered into a case plan with DFS, with a goal of reunification. While the children remained in foster care, DFS and other agencies continued to provide services for appellant and her family. The services included a DFS homemaker visiting the home as many as five days a week to help the family with budgeting and organization of the household. Parenting classes, nutrition classes and mental health counseling were also provided.

Pursuant to court approval, the two older children were returned to appellant's physical custody in June of 1991. Due to continued feeding difficulties, WHR was not returned until October of 1991. DFS retained protective custody of the children and continued to provide services for the family.

The children, including new sibling BNR, were again removed from appellant's home in June of 1993. At this time, DFS discovered appellant's four children, along with three other children, in the care of a young babysitter in appellant's home. The children were dirty and had dried feces on their bodies. The floors were covered with piles of dirty clothes. The children had nowhere to sleep, as the beds were wet with urine. The toilet would not flush. The only food in the home was a nearly empty box of Malto Meal. There was, however, alcohol in the refrigerator. The steps to the trailer home were

---

* Chief Justice at time of oral argument; retired November 2, 1998.

1. At the time of the termination hearing, the father of the three younger children voluntarily relinquished his parental rights, conditioned on appellant's parental rights being terminated at the hearing.

unsafe, and there was broken glass in the yard.

Shortly after the children were removed, the parents divorced. All four children were placed with the same foster family but proved too difficult to manage in one home, as they all have special needs. ZKP has been diagnosed with Attention Deficit Hyperactivity Disorder. Both ZKP and BNR suffer from Reactive Attachment Disorder, meaning they have difficulty bonding with and trusting adults. BNR and WHR both display speech and language disabilities. WHR also requires physical therapy and has a visual problem. BLR has been diagnosed with a motor disability. The children were split up, with ZKP and BNR placed together in a different foster home.

Another plan for reunification was established. The plan was to return the two older children to appellant's home first, and eventually the two younger children would follow. The plan also permitted appellant supervised visitation. In May of 1995, the two older children were placed in appellant's home. In June of 1995, ZKP proved too difficult for appellant to control, and appellant turned him over to DFS. DFS returned him to appellant a week later. In July of 1995, DFS learned that the gas in appellant's home had been turned off because the bill had not been paid. Also, appellant was living with a man addicted to methamphetamine. On July 14, 1995, ZKP and BNR were removed from appellant's home for the final time.

Except for short periods of visitation, the two younger children have remained with the same foster family since June of 1993. They have bonded with their foster family; and the family, if permitted, plans to adopt them. The two older children have lived together with the same foster parents since July of 1995, and the foster parents intend to provide long-term care. At the time of the termination hearing, appellant was awaiting sentencing in Natrona County on charges of burglary and delivery of a controlled substance. She had previously pled guilty to these charges.

DFS petitioned for termination of parental rights in September of 1996, alleging that the children had been abused and neglected.

The district court appointed counsel to represent appellant, and the children were represented separately by a guardian ad litem. After a two-day bench trial, the district court terminated appellant's parental rights to all four children. She timely appeals.

### STANDARD OF REVIEW

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. *TR v. Washakie County Dep't of Pub. Assistance & Soc. Servs.*, 736 P.2d 712, 715 (Wyo.1987). As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Wyo. Stat. Ann. § 14–2–309(a) (Michie 1997); *In Interest of JG*, 742 P.2d 770, 773 (Wyo. 1987); *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d 911, 919 (Wyo.1980). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Matter of GP*, 679 P.2d 976, 982 (Wyo.1984). Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *Matter of SYM*, 924 P.2d 985, 987 (Wyo. 1996). Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. *Id.*; *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 919–20; *In Interest of JG*, 742 P.2d at 773.

### DISCUSSION

Termination of parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii) was ably summarized in *Matter of SYM*, 924 P.2d at 987:

Wyo. Stat. § 14–2–309(a)(i) through (iv) affords four independent bases for the termination of parental rights. Termination actions taken pursuant to Wyo. Stat. § 14–2–309(a)(iii) focus upon the unfitness of the

parent, requiring the petitioner to establish three elements:

> "(1) [A]busive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family (i.e. termination of parental rights is the least intrusive means to satisfy the State's interest); and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent."

(Citations omitted.) Abuse and neglect are defined in Wyo. Stat. Ann. § 14–3–202(a)(Michie 1997):

> (ii) ... "Abuse" with respect to a child means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law:
>
> > (A) "Mental injury" means an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in his ability to function within a normal range of performance and behavior with due regard to his culture.
>
> ...
>
> (vii) ... "Neglect" with respect to a child means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being.

### Neglect and Abuse

■ Because the evidence of neglect is most prevalent, our discussion begins there. Neglect was established at the termination hearing by evidence of inadequate care, maintenance, and supervision. The children were poorly supervised, when supervised at all. DFS workers reported that the children would run wildly about the home while the parents slept. On one occasion, the children were left alone while the parents were in a bar. Another time, the children were left unattended at a park. When the children were removed in June of 1993, they had been left in the care of a young babysitter, along with three other children.

The record also establishes inadequate maintenance and care. The home was filthy and disorganized. Dirty clothes, beer cans, feces, knives, forks and broken glass all cluttered the floors. The children were often dirty and improperly clothed. There was a general lack of attention to bedtimes and feeding times. Frequent disreputable house guests added to the disharmony. Appellant's method of organization ensured a place for nothing and that nothing was in its place. The last time the children were removed, the gas in the home had been shut off. The outside of appellant's home was also unkempt. In June of 1993, the steps leading up to the trailer home were treacherous, and there was broken glass in the yard.

■ Despite this evidence, appellant argues that DFS did not establish that the health and safety of the children were in jeopardy. In *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 919, we said, "[S]lovenliness in keeping a young child clean or his home in good order may offend many of us and may, by some, be characterized as neglect, but is not such neglect—assuming no serious health effect or risk—as will justify termination of parental rights." The evidence here shows that the home, both inside and out, was dangerous for these children. "A child has a fundamental right to live in an environment free from filth, health hazards and danger." *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984). Neglect was established by clear and convincing evidence.

■ Abuse was also clearly established by evidence of malnutrition and mental injury. At the time of their removal in 1993, the children were malnourished, and there was almost no food in the home. Malnutrition is further evidenced by WHR's failure to thrive and ZKP's hoarding of food. More evidence of abuse came when a psychologist testified that ZKP and BNR display behaviors consistent with having been sexually abused. ZKP complained that he had been molested by a

cousin and that he witnessed his mother having sex with a boyfriend in the living room. He has threatened suicide and molested other children. The psychologist confirmed that BNR is a victim of sexual abuse. BNR mutilates herself, chewing her lips until they bleed. She will scream for hours at a time. She also inserts objects into her vagina, in one instance requiring a trip to the hospital for removal of the object. The evidence presented at the termination hearing was sufficient to show that the children have been abused.

### Rehabilitative Efforts

■ Having found the threshold of abuse and neglect to be established, we must next examine whether means less intrusive than termination were attempted without success. The record reveals repeated attempts to equip appellant with homemaking and parenting skills to enable her to effectively raise her children. A teaching homemaker was sent to appellant's home, sometimes as many as five days a week, to help her organize the housework and child care. Nutrition education, parenting programs, and mental health counseling were all provided for appellant.

Appellant argues that she has cooperated with all DFS requests and programs. However, problems arose because appellant would not follow through with the programs. Worse, appellant sometimes resisted the rehabilitative efforts, one time ordering BNR to hide under her bed and remain quiet so a DFS homemaker would think they were not home. Appellant also failed to attend numerous appointments and failed to get the children to their appointments. During one period, ZKP was absent from 70 of 104 head start classes. DFS warned appellant that she needed to improve the filthy and unsafe conditions in her home or her children would be taken away. Despite these warnings, the situation did not improve.

The record demonstrates repeated rehabilitative efforts and plans for reunification. One DFS agent calculated that DFS had spent $147,000 on various plans, programs, and foster care for appellant and her family. DFS never refused appellant any services.

The guardian ad litem testified that DFS had gone above and beyond its call of duty in this case. All efforts to rehabilitate appellant and reunite the family have failed. The evidence was sufficient to establish this element.

### Children's Health and Safety if Returned to Appellant

■ The final element to consider under Wyo. Stat. Ann. § 14-2-309(a)(iii) is whether the children's health and safety would be seriously jeopardized should they be returned to appellant's custody. Despite a variety of intensive rehabilitative efforts, appellant has proved herself incapable of properly caring for her children. Visits between appellant and her children proved counterproductive, damaging the already fragile emotions of the children. Around the time of these visits, the children would revert to abnormal behaviors. BNR would throw tantrums, at times screaming for hours. She would also resort to self mutilation. ZKP would hoard food and act out by hiding or running away. WHR would throw tantrums more frequently after visits with appellant. When ZKP and BNR were removed from appellant's home in 1995, their foster mother reported that they were like wild animals. Afraid of going hungry, the two would gorge themselves. ZKP would hoard food. BNR would scream for hours.

The record reveals that the children are slowly progressing toward emotional stability while in foster care. The children's psychologist, DFS caseworkers, and the guardian ad litem all opined that the children's health and welfare would be seriously jeopardized if the children were returned to appellant. The psychologist testified:

> I believe that these children cannot be expected to protect themselves. My opinion is that they would be in severe jeopardy ... These children show all the signs of maltreatment and mental injury. They are terrorized; they're fearful ... I believe it would be very, very damaging for these children to be taken from where they are presently and returned to the care and custody of the mother.

We must agree. There was sufficient evidence to establish this final element.

We hold there was sufficient evidence to establish that appellant's children have been neglected and abused, that efforts to rehabilitate the family have been unsuccessful, and that the children's health and safety would be seriously jeopardized if they were returned to appellant.

## CONCLUSION

"Where is there a more sensitive place in the law than that area where courts must undertake to decide whether or not a child will be taken from its mother? We know of none." *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 913. After a careful review of the tragic evidence in this case, we conclude that it was more than sufficient to permit the district court to terminate appellant's parental rights to ZKP, BNR, WHR, and BLR.

Affirmed.