989 P.2d 1268 (1999)
In the Matter of the Interest of JL, ES, and TL, minors:
RS and LS, Appellants (Respondents),
v.
Johnson County Department of Family Services, Appellee (Petitioner).
No. C-99-3.
Supreme Court of Wyoming.
November 5, 1999.
*1269 Representing Appellants: Hardy H. Tate, Sheridan, WY. Argument by Mr. Tate.
Representing Appellee: Gay Woodhouse, Attorney General; Michael L. Hubbard, Deputy Attorney General; Dan S. Wilde, Assistant Attorney General; and Christopher Petrie, Special Assistant Attorney General. Argument by Mr. Petrie,
Guardian ad litem: Sean P. Durrant of Palmerlee & Durrant, Buffalo, WY.
Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.
HILL, Justice.
After seven years of rehabilitative efforts, Appellee, Johnson County Department of Family Services (DFS), brought an action to terminate the parental rights of Appellants, LS (Mother) and RS (Father), to their daughter, ES, and Mother's daughter, TL, and son, JL. Appellants challenge the sufficiency of evidence to justify terminating their parental rights to each of the children. We find clear and convincing evidence to support the trial court's decision, and thus affirm the judgment of the district court.

ISSUE
Appellants present one issue for review which is essentially reiterated by Appellees:
Did the district court err in determining that clear and convincing evidence was presented to terminate parental rights as applied to each of the three children[?]

FACTS
At the age of 15, Mother was sexually abused by her stepfather.[1] As a result, Mother moved to Oregon to live with her natural father. While in Oregon, Mother was diagnosed with depression and subsequently received medication and attended counseling. In 1987, when Mother was 17 years old, she moved in with RL (father of the two oldest children), whom she later married.
The first child, TL, was born on October 10, 1990. In January of 1992, the Washington Family Service Agency contacted the family due to reports of domestic violence and possible child abuse. Three months after the initial involvement of the Washington agency, the second child, JL, was born. As an infant, JL was diagnosed with "failure to thrive."
When the family moved to Wyoming in early June, 1992, DFS contacted them at the request of the Washington agency. Shortly thereafter, on June 12, DFS received a complaint regarding an occurrence of domestic violence and possible child abuse. In the fall of 1992, Mother admitted RL was abusive toward her and the children. She filed for a divorce and moved with the children into a trailer. When the divorce was finalized in 1993, Mother was awarded primary custody.
In early 1993, DFS employees John Notebloom and Sandy Rubottom investigated a report of possible child neglect made by Madonna Esponda, a social worker who lived next door to Mother. The investigation led to the first case plan for Mother in April of 1993, citing family preservation as the goal. The plan included anger management counseling twice weekly and in-home parenting *1270 instruction four hours per week. Mother was once again diagnosed with depression and in March, 1994, was evaluated as having a below normal intelligence.
Mother and Father were married in June, 1994. Although Father initially refused to be involved in the DFS plan prior to the marriage, he later agreed and was included in the services provided to the family. Mother's and Father's daughter, ES, was born on April 6, 1995.
Between 1993 and 1996, additional services were offered to the family due to the lack of Appellants' progress. The services included day care for TL and JL at the Buffalo Children's Center, transportation for members of the family, when necessary, and increased parenting classes and counseling. During this time, TL and JL were diagnosed with reactive attachment disorder stemming from neglect and abuse, attention deficit hyperactivity disorder, and oppositional defiant behavior.
The parents became increasingly agitated by the constant surveillance by DFS, culminating in the assignment of another home aide. The tension also affected the marriage, with the blame going to the two older children. In April of 1995, DFS began receiving allegations of physical child abuse. There were also indications of spousal abuse, and in July of 1995, Father was arrested for assault on Mother.
In December of 1995, Mother and Father placed TL with her grandmother because Father threatened to leave if TL stayed in the home. Although TL was allegedly benefitted by this arrangement, DFS raised concerns regarding TL's proximity to the perpetrator of Mother's past sexual abuse. However, DFS was assured that stepfather would not be alone with TL.
In May of 1996, when JL arrived at day care with a bruised back and buttocks, Mother and Father were charged with three counts of felony child abuse. JL and ES were immediately placed into protective custody. Appellants pleaded guilty to one count and were placed on probation. Although ES had been returned to the home several days after the arrest, she was again placed with JL's foster family in April of 1997 due to Appellants' failure to follow the probation requirements concerning her supervision. In June of 1997, the oldest child, TL, was placed in therapeutic foster care when DFS learned that Mother's stepfather was being left alone to supervise TL.
A series of case plans were devised over the years, but Appellants' behaviors and skills remained substantially the same. Even after the children were removed from the home, Appellants continued to receive counseling and other services, as well as supervised visitation. In the meantime, the children's physical and mental well-being greatly improved while in foster care.
In February of 1998, the county attorney saw no progress in Appellants' behaviors and skills and filed a petition to terminate their parental rights due to a failure to rehabilitate. A trial was held on December 1, and 2, 1998, wherein the district court heard testimony from social workers, day care providers, teachers, neighbors, counselors, and Appellants. The district court concluded that clear and convincing evidence demonstrated that all three children were abused and neglected by Appellants; that the children's health and safety would be seriously jeopardized if returned to Appellants' custody; and that termination of Appellants' parental rights was in the children's best interests. This timely appeal followed.

STANDARD OF REVIEW
We have held that the right to associate with one's family is a fundamental liberty under both the United States Constitution and Article 1, Sections 2, 6, 7, and 36 of the Wyoming Constitution. DS v. Department of Public Assistance and Social Services, 607 P.2d 911, 918 (Wyo.1980). In Matter of GP, 679 P.2d 976, 982 (Wyo.1984) our standard of review was set forth as follows:
Strict scrutiny is the test which will be employed when balancing a fundamental right against a compelling state interest, which interest is, in this case, the welfare of the children. The compelling state interest having been established, it is necessary to prove that the method sought to achieve it is the least intrusive of those *1271 methods by which the state's interest can be fulfilled. State in Interest of C, Wyo., 638 P.2d 165 (1981) [citations omitted].
The evidence which will countenance a termination must be clear and convincing (§ 14-2-309(a), supra). We explained what we mean by "clear and convincing" evidence in Thomasi v. Koch, Wyo., 660 P.2d 806, 811-812 (1983), where we said:
"* * * This court previously has adopted language to this effect:
"`* * * When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory.' Continental Sheep Co. v. Woodhouse, 71 Wyo. 194, 202, 256 P.2d 97 (1953), quoting language found in Good Milking Mach. Co. v. Galloway, 168 Iowa 550, 150 N.W. 710, 712 (1915).
"We further have said that clear and convincing evidence is 'that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.' MacGuire v. Harriscope Broadcasting Co., Wyo., 612 P.2d 830, 839 (1980)."
See also Matter of ZKP, 979 P.2d 953 (Wyo. 1999). We accept as true the evidence of the successful party, leave out of consideration the evidence of the unsuccessful party in conflict therewith, and give the evidence of the successful party every favorable inference which may fairly and reasonably be drawn therefrom. Id.; DS, 607 P.2d at 918.

DISCUSSION
Wyoming's termination-of-parental-rights statute, Wyo. Stat. Ann. § 14-2-309(a)(iii) (LEXIS 1999), provides in relevant part:
§ 14-2-309. Grounds for termination of parent-child legal relationship; clear and convincing evidence.
(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
....
(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent[.]
Section 14-2-308 refers to Wyo. Stat. Ann. § 14-3-202(a)(ii) (LEXIS 1999) for a definition of "abuse," which states:
(ii) ... "Abuse" with respect to a child means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law[.]
Appellants claim that there was insufficient evidence to prove clearly and convincingly that each of the children was abused and neglected by them, and that each child's health and safety would be seriously jeopardized by the maintenance of the parent-child relationship between them and each of the children. We disagree.

A. Neglect and Abuse
Neglect was established by the presentation of evidence demonstrating inadequate care, maintenance, and supervision. Testimony from neighbors and care providers established that the home was filthy, and that garbage and dirty clothes were strewn throughout the trailer and within the children's access. A single mattress, placed on an unclean floor, constituted sleeping arrangements for the children. Dangerous medications were left in reach of the children in a drawer containing candy, despite consistent warnings to avoid this problem.
TL and JL were often so dirty when they arrived at day care that the other children refused to associate with them because they smelled of urine. Dried feces would be found on their diapers and clothing. TL and JL also were often inappropriately dressed *1272 for the weather, arriving without a coat or socks on snowy days. Both children were extremely difficult to control, exhibiting violent behavior and inappropriate language directed toward the teachers and other children. The children routinely arrived at day care unfed. Appellants failed to give the children their medication, or neglected to administer the proper dosage, and failed to send the medication to day care when necessary.
Appellants' inappropriate physical punishment of both TL and JL was also a subject of ongoing concern. Violence in the home occurred frequently in the presence of all the children. Neighbors testified that there were daily fights, screaming, and verbal abuse.
Foster mother for ES and JL testified that when the children came to her home, they were deeply troubled. In addition to the aggressive behaviors of JL recited above and his diagnosis of reactive attachment disorder stemming from neglect and abuse, he was afraid of being outside alone, afraid of thunder, and afraid of the dark. When ES arrived in 1997, she exhibited an eating disorder and would take food from the garbage or off the street. She would not sleep in a bed and attempted to wander through the house at all hours of the night. She had severe ear infections and dental problems, and when around adults, she would scream.
It is undisputed that TL also suffered from reactive attachment disorder stemming from neglect and abuse. In addition, foster mother for TL testified that when TL arrived, she had few social skills and would go into rages two or three times a day, "screaming, hitting, and cussing." TL also exhibited facial ticks which have all but disappeared since she has been in foster care.
Appellants concede that there may be sufficient evidence of abuse and neglect in the cases of JL and TL, but not for ES. However, ample evidence proved that ES was clearly exposed to a dangerous environment, and her physical needs were being ignored. As we said in DS, "[i]t would, indeed, be a sad commentary upon the law if it were unable to come to the aid of an abused or neglected child until there was an actual manifestation of some serious damage." 607 P.2d at 922-23. See also In re ZKP, 979 P.2d at 957-58, and Matter of GP, 679 P.2d at 1007.

B. Efforts to Rehabilitate
We now turn to the second statutory consideration: whether "reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family." Testimony from numerous social workers and mental health professionals detailed the extensive efforts to assist Appellants in developing nurturing behaviors. In-home and outreach classes utilized every feasible educational approach to communicate with Appellants. Appellants were given parenting classes, anger management counseling, individual counseling, and job counseling for a period extending over six years. While Appellants accepted these services, the providers unanimously testified that no significant progress was made during that time and, in fact, Appellants' behaviors seemed to regress as the Appellants' increasing anger toward the providers engendered a resistance to these efforts. Thus, the evidence was clear and convincing that the rehabilitative efforts made by authorized agencies were unsuccessful.

C. Future Health and Safety of the Children
Finally, we direct our attention to whether the health and safety of the children would be seriously jeopardized by returning to Appellants. It is clear that the children were significantly troubled and in need of constant care and supervision to recover from their earlier trauma. We quote from the testimony of Linda McNeill, a psychologist who attended to the entire family:
Q. When you say, you know, the health and safety of the children, what types of things would you expect if the children were returned to the home? What would you expect to see on the professional level?
A. I think that their negative behavior would escalate. I think they would be extremely defiant with the parents and with other people. I don't think [Appellants] can provide the nurturing, but also *1273 the strong discipline that needs to be done without using physical discipline.
....
Neither of these children can tolerate physical discipline or shouldn't have physical discipline, because they are so aggressive themselves and interact in aggressive ways with their peers.... And sometimes its very hard to stick to those kind of guidelines.
....
[In regard to ES], it was at about three-and-a-half that I first evaluated each, [JL] and [TL]. And that's when each of their behaviors had escalated to a point that somebody was asking me to evaluate. But I think at this point she would also create the kind of difficulty for them of a child who has her own will and is testing it and being active and exuberant.
And I fear that they would not provide appropriate discipline or watch her, ... I don't see them providing the physical care.
There is no doubt that after the intensive but unsuccessful efforts made on behalf of Appellants, these children's health and safety would be seriously jeopardized if they were to be returned to the same environment which necessitated their removal in the first place.

CONCLUSION
Strict scrutiny of the application of the parental-rights-termination statute in this case demonstrates clearly and convincingly that the State's compelling interest in protecting the welfare of these three children can be met only by terminating Appellants' parental rights with respect to each child.
The judgment of the district court is affirmed.
NOTES
[1] Stepfather was convicted and sentenced to prison for sexual assault on Mother when she was a minor.